**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

| | |
|---|---|
| DEPAUW UNIVERSITY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) CAUSE NO.: 2:05-CV-0249-RLY-WGH |
| HENNESSEE GROUP LLC, | ) |
| CHARLES GRADANTE and | ) |
| E. LEE HENNESSEE, | ) |
| | ) |
| Defendants. | ) |

**DEPAUW'S OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS OR TRANSFER**

## I.      INTRODUCTION

To ensure that its endowment investments are properly diversified, DePauw

University ("DePauw" or "the University") decided that it needed to consider investing some of

its money in hedge funds.  Lacking the institutional expertise and resources necessary to evaluate

the vast number of funds that are available in the market, the University sought professional

help.  It engaged the services of defendant Hennessee Group LLC ("Hennessee Group"), which

claimed to be the leading expert in hedge fund analysis.

In a written report sent to DePauw and distributed to the University's Investment

Committee, Hennessee Group recommended that DePauw invest $3.25 million in the Bayou No

Leverage Fund ("Bayou Fund").  As part of that recommendation, Hennessee Group made a

number of representations concerning the Bayou Fund's performance, its management, its risks,

its auditor, and the extensive diligence that Hennessee Group claimed to have done, all of which,

- 1 -

according to Hennessee Group, supported the investment recommendation. DePauw accepted Hennessee Group's recommendation and invested in the Bayou Fund.

Unbeknownst to DePauw, the Bayou Fund was a sham—complete with fabricated resumes, fictitious investment results, a phony auditing firm, and multiple red flags that Hennessee Group either misrepresented or simply failed to disclose. The Bayou Fund's principals have now pled guilty to fraud and conspiracy charges and face prison terms. The Fund is in receivership. Investors such as DePauw stand to recover pennies on the dollar.

DePauw sued Hennessee Group and its two Managing Principals, Charles Gradante ("Gradante") and E. Lee Hennessee ("Lee"), on October 12, 2005. DePauw's Complaint includes claims (a) under the Indiana Securities Act, Ind. Code § 23-2-1-19, (b) for breach of fiduciary duty, (c) under the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and (d) for breach of contract. [1]

The defendants have moved to dismiss the Complaint, claiming that they are not subject to personal jurisdiction and that venue is not proper in this District; in the alternative, they ask the Court to transfer the case to New York, where Gradante and Lee reside and Hennessee Group has its offices.

The motion is without merit and should be denied. First, because DePauw's complaint includes a claim under the Securities Exchange Act, which permits nationwide service of process, the settled law in the Seventh Circuit holds that defendants are subject to personal jurisdiction in this District so long as they have minimum contacts <u>with the United States</u>. Secondly, even apart from the '34 Act's jurisdictional reach, the defendants have ample contacts

---

[1]   Under the Indiana Securities Act, Ind. Code § 23-2-1-19(d), and the Securities Exchange Act of 1934, 15 U.S.C. § 78t, Gradante and Lee, as Managing Principals and control persons, are jointly and severally liable with and to the same extent as Hennessee Group for DePauw's losses in this case.

with Indiana sufficient to support this Court's exercise of personal jurisdiction over them. They entered into a relationship with DePauw under which they agreed to provide investment advice in exchange for (handsome) fees and, pursuant to that arrangement, sent a written recommendation report (and scores of related communications) to Greencastle, Indiana, that contained demonstrable falsehoods. Having purposefully availed themselves of the opportunity to make money by providing investment advice to an Indiana resident and having purposefully directed two years' worth of communications to our State in furtherance of that business relationship—including in particular the written recommendation to invest in Bayou Fund that contains the misrepresentations on which DePauw's claims are principally based—the defendants cannot fairly complain about having to answer for their behavior in the jurisdiction in which they caused injury. These same facts, moreover, establish the basis for venue in this District, and the Court should respect the University's choice of this forum to resolve its dispute. This District is more than just DePauw's home; it is the forum in which a substantial portion of the events giving rise to DePauw's claims occurred—not the least of which, again, is the defendants' transmission of a written recommendation report on which DePauw relied to make the investment in what has now been shown to have been a complete scam. For these reasons and as more fully explained below, the Court should deny the defendants' motion and order the defendants to answer DePauw's Complaint.

## II.     FACTS SUPPORTING JURISDICTION AND VENUE

DePauw is a not-for-profit corporation organized under the laws of Indiana that operates a university in Greencastle, Putnam County, Indiana. (Cmplt. ¶ 1, Defs. Brf. at 2.) DePauw holds certain of its funds in an endowment ("the Endowment") through which the University makes investments. (*Id.* ¶ 6; Declaration of Carla C. McGuire ¶ 2, Ex. A.) DePauw's

Chief Investment Officer, Carla McGuire ("McGuire"), manages the Endowment on a day-to-day basis, and a committee of DePauw's Board of Trustees, known as the Investment Committee, oversees the Endowment and McGuire's management of it.  (McGuire Decl. ¶ 2.)  Although McGuire is not an Indiana resident—she travels frequently on behalf of the University, including to Greencastle, so she functions from a number of places—she pays Indiana income taxes, and her administrative assistant works on campus in Greencastle.  (*Id.* ¶ 3.)

**DePauw Decides to Seek Investment Advice from Defendants**

Hennessee Group had discussed entering into a relationship with DePauw before McGuire arrived, meeting several times with McGuire's predecessor as Chief Investment Officer, Jerry Burroughs ("Burroughs").  (Defs. Brf. at 2-3; McGuire Decl. ¶ 5.)  In late 2002, Hennessee Group prepared a sample investment portfolio for Burroughs and DePauw's Investment Committee.  (Defs. Resp. at 3.)  On May 30, 2003, it made a presentation to Burroughs and four members of DePauw's Investment Committee.  (McGuire Decl. ¶ 5.)  Hoping to land a contract at that time, Gradante sent Burroughs a letter on June 11, 2003, directed to Burrough's office at One Indiana Square in Indianapolis, enclosing two copies of a proposed investment advisory agreement for Burroughs's "review and signature."  (*Id.* ¶ 6 & Ex. 1.)  DePauw did not enter into an agreement with Hennessee Group at that time.  (*Id.* ¶ 6.)

After McGuire became the University's Chief Investment Officer in September 2003, she picked up the dialogue with Hennessee Group.  (*Id.* ¶ 7.)  McGuire spent several hours talking with representatives of Hennessee Group in their offices in New York City and reviewing their due diligence materials concerning various hedge funds.  (*Id.*)  Based on her discussions and review, McGuire advised DePauw to enter into a relationship with Hennessee Group to secure the benefit of Hennessee Group's expertise and experience in making and managing

- 4 -

investments in hedge funds. (*Id.*) In McGuire's and the Investment Committee's judgment, DePauw did not have the expertise or the resources necessary to perform the kind of due diligence that Hennessee Group claimed to be able to perform, or to evaluate the merits of various hedge fund investments as Hennessee Group claimed to be able to do. (*Id.*) Accordingly, DePauw decided to engage Hennessee Group to advise the University concerning hedge fund investments.

**Defendants Enter Into a Long-Term Business Relationship and Begin to Advise DePauw**

During the week of November 10, 2003, McGuire met with managers and other representatives of approximately twelve hedge funds that Hennessee Group had recommended DePauw consider for possible investments. (*Id.* ¶ 8.) One evening that week, McGuire met with Gradante and Brian Snider ("Snider"), an analyst employed by Hennessee Group who had arranged and accompanied McGuire to the meetings with the hedge fund managers that week. (*Id.*) McGuire asked Gradante and Snider to prepare recommendations for DePauw concerning each of the hedge funds in which Hennessee Group recommended that DePauw invest. (*Id.*)

DePauw and Hennessee Group entered into an Investment Advisory Agreement ("Agreement"), with McGuire signing on behalf of DePauw on November 18, 2003, and Gradante signing on behalf of Hennessee Group the next day. (*See* Cmplt, Ex. A; McGuire Decl. ¶ 10.) Under the Agreement, Hennessee Group agreed (a) to "perform search, evaluation, selection, and introduction services" for DePauw, (b) to "introduce [DePauw] to one or more Hedge Fund(s) that Hennessee [Group] reasonably believe[d] would be appropriate investment vehicles for" DePauw, (c) to "provide continuous and ongoing performance monitoring of the Portfolio," and (d) to "provide [DePauw] with highly confidential information, research and

- 5 -

analyses it compiles about numerous hedge funds." (Cmplt., Ex. A.)  DePauw in turn agreed to pay fees to Hennessee Group in exchange for these services. (*Id.*)

### Defendants Recommend the Bayou Fund Via a (False) Report Sent to Greencastle

On November 14, 2003, Hennessee Group sent McGuire one of the first of what would be scores of e-mails over the next two years.   In it, Snider, who became McGuire's primary contact at Hennessee Group, told McGuire, "please consider us an extension of your office." (*Id.* ¶¶ 9, 11 & Ex. 2.)  McGuire replied to Snider and requested that Hennessee Group direct e-mail communications to her at her DePauw e-mail address—cmcguire@depauw.edu. (*Id.*)[2]

On November 18, 2003, McGuire sent Snider an e-mail from her DePauw e-mail address. (*Id.* ¶ 15 & Ex. 3.)  McGuire attached to that e-mail an electronic copy of a memorandum template that she had created, which reflected the general format that McGuire used to create memoranda for submission to DePauw's Investment Committee. (*Id.*)  McGuire wanted to use that form to submit memoranda to the Investment Committee containing Hennessee Group's recommendations for hedge fund investments and whatever due-diligence and other information Hennessee Group chose to provide in support of its recommendations. (*Id.*)

---

[2]   When Hennessee Group sent e-mails to that address—as it did from that point forward—the e-mails were routed to, and became resident on, a computer server on DePauw's campus in Greencastle, Indiana.  (Declaration of Richard Speller ¶ 4, Ex. B.)  When the recipient of an e-mail sent to a "depauw.edu" address accesses his or her e-mail, whether from a computer on DePauw's campus or from some other location by means of DePauw's remote-access capability, the recipient connects electronically to the on-campus server on which the e-mail is stored. (*Id.*)  The recipient's computer allows the recipient to retrieve and read the information that the sender caused to be sent to and stored on the on-campus server. (*Id.*)  McGuire in particular takes advantage of this capability because of her frequent travel on behalf of the University, accessing DePauw's e-mail server from the campus, from her home office, and from other locations to which she travels.  (McGuire Decl. ¶ 14.)

On November 19, 2003, while McGuire was in Greencastle, Snider responded to McGuire's e-mail of the previous day with an e-mail sent to McGuire's DePauw e-mail address. (*Id.* ¶ 16 & Ex. 3.)  McGuire in turn responded to Snider's e-mail that same day, from Greencastle.  (*Id.* ¶ 16 & Ex. 3.)  In the response, McGuire told Snider that she wanted to include Hennessee Group's investment recommendations in the January Investment Committee meeting book that she would provide to each member of DePauw's Investment Committee.  (*Id.*)

On December 8, 2003, Snider sent an e-mail to McGuire at her DePauw e-mail address attaching drafts of Hennessee Group's "write-ups" for two investment recommendations, including its recommendation of the Bayou Fund.  (*Id.* ¶ 17 & Ex. 4.)  The information contained in that "write-up" is the information that is referred to in paragraphs 10 and 13 of DePauw's Complaint in this case.  (Cmplt. ¶¶ 10, 13; McGuire Decl. ¶ 17.)  The information was included without substantive change in the report submitted to DePauw's Investment Committee that is attached as Exhibit B to DePauw's Complaint.  (McGuire Decl. ¶ 18.)  Gradante, Lee, and Snider discussed that information and their recommendation concerning the Bayou Fund, among other investments, with the members of DePauw's Investment Committee at a meeting in Florida on January 16, 2004.  (*Id.*)  Based on that information and Hennessee Group's recommendation, DePauw invested $3.25 million in the Bayou Fund.  (*Id.* ¶ 19.)

**Hennessee Group's Additional, Continuing and Systematic Contacts with DePauw**

Over the course of the roughly two-year relationship between DePauw and Hennessee Group, all of the communications and interaction that McGuire had with representatives of Hennessee Group relating to hedge funds were in her capacity as DePauw's Chief Investment Officer; none was in her individual capacity.  (*Id.* ¶ 12.)  From the time that DePauw entered into the Agreement with Hennessee Group in late 2003 until DePauw

- 7 -

terminated the Agreement in October 2005, representatives of Hennessee Group communicated with McGuire scores of times via telephone and e-mail. (*Id.* ¶ 13.) McGuire received calls from Hennessee Group on her cellular phone while she was in Greencastle, Indiana. (*Id.*) For instance, Gradante initiated a call to McGuire concerning DePauw's investment in the Bayou Fund while McGuire was in Greencastle on August 25, 2005. (*Id.* ¶ 13.)

In addition to the investment recommendations that Hennessee Group sent via e-mail to McGuire at her DePauw e-mail address, Hennessee Group also sent monthly reports regarding DePauw's hedge fund investments to that same address, including reports concerning the purported performance of the Bayou Fund. (*Id.* ¶ 20 & Ex. 5.) Hennessee Group also prepared and sent McGuire numerous other presentations for DePauw's Investment Committee. (*Id.* ¶ 21.) These included presentations to DePauw's Investment Committee dated February 17, 2004; April 2004; October 7, 2004; January 14, 2005; April 22, 2005; June 22, 2005; and October 27, 2005. (*Id.*) Further, Hennessee Group sent additional background information regarding the hedge fund industry to McGuire's DePauw e-mail address on September 24, 2004. (*Id.* ¶ 22 & Ex. 6.) In that e-mail, Snider stated: "We'd be more than willing to physically give the presentation [to DePauw's Investment Committee] since there are some items that might need to be explained in more detail. Which reminds me, do you want us to be present at your investment committee meeting annually?" (*Id.*) Hennessee Group also e-mailed McGuire, again at her DePauw address, numerous other performance and monitoring reports concerning the hedge fund investments that DePauw had made on Hennessee Group's recommendation. (*Id.* ¶ 23.)[3]

---

[3]   Ironically, *Forbes* magazine published an article on the rapidly growing, and largely unregulated, hedge fund industry in its May 24, 2004, issue, in which the authors wrote that hedge funds are "rife with exorbitant fees, phony numbers and outright thievery" and that "most investors should steer clear of hedge funds." (Neil

Additionally, Hennessee Group requested to have direct communications with individual members of DePauw's Investment Committee. (*Id.* ¶ 25.)[4]  To facilitate those communications, McGuire provided Hennessee Group with contact information for each member of the Investment Committee.  (*Id.*)  As a result, Hennessee Group sent monthly newsletters and miscellaneous other correspondence direct to members of the Investment Committee.  (*Id.*)

Finally, representatives of Hennessee Group were, for several months in advance, scheduled to attend the meeting of DePauw's Investment Committee in Greencastle, Indiana, in conjunction with the meeting of DePauw's Board of Trustees at DePauw's campus in October 2005.  (*Id.* ¶ 26.)  In the wake of DePauw's termination of its Agreement with Hennessee Group and filing of this lawsuit, however, the Hennessee Group representatives did not attend that meeting.  (*Id.*)

**Why DePauw Brought This Lawsuit**

Last summer, the Bayou Fund's managers abruptly closed shop.  They told investors that their money would be distributed to them in due course, but that has not happened, and will not, except for what federal authorities are able to marshall—perhaps 20 cents on the dollar.  From actions filed by the Securities and Exchange Commission,[5] the Commodity Futures Trading Commission,[6] the United States Attorney for the Southern District of New York (to

---

[4] Weinberg & Bernard London, "The Sleaziest Show On Earth," *Forbes*, May 24, 2004.)  Apparently concerned that the members of DePauw's Investment Committee would read the article and have concerns about it in view of DePauw's foray into hedge funds on Hennessee Group's advice, Snider e-mailed a copy of the article to McGuire on May 13, 2004, saying "Here is the Forbes article again.  Your committee members might ask about it, so I want you to be prepared."  (McGuire Decl. ¶ 24 & Ex. 7.)

[4] One member of the Investment Committee is a resident of Indiana; and of course, all serve the University when they discharge Committee work.  (McGuire Decl. ¶ 25.)

[5] *SEC v. Israel*, No. 05-Civ-8376 (S.D.N.Y. Sept. 29, 2005).

[6] *Commodity Futures Trading Comm'n v. Bayou Management, LLC,* No. 05-Civ-8374 (S.D.N.Y. Sept. 29, 2005).

- 9 -

which the Bayou Fund's former Chief Investment Officer and Chief Financial Officer have pled

guilty),[7] and a string of articles in the press,[8] we now know that the Bayou Fund was a scam and

had been since approximately 1997. Among other things:

- The investment performance results that Hennessee Group had provided to DePauw in its recommendation report for the Bayou Fund had been fabricated; the Bayou Fund's managers had lost millions of dollars every year since they began operating their scam in or about 1996.

- The auditing firm that Hennessee Group had said was auditing the Bayou Fund (Hertz Herson) had never in fact audited the Bayou Fund.

- The Bayou Fund's managers had created a fictitious auditing firm ("Richmond-Fairfield") that they claimed was auditing the Fund, but Hennessee Group had not even disclosed the existence of that firm to DePauw—even though Hennessee Group was receiving audit reports supposedly prepared by Richmond-Fairfield.

- The report concerning Richmond-Fairfield available on a web site maintained by the Office of the Professions of the New York State Education Department disclosed that the Fund's Chief Financial Officer was a member/manager of Richmond-Fairfield, such that Richmond-Fairfield could not have performed independent audits even if it had been *bona fide*.

- The Bayou Fund's Chief Investment Officer had falsified significant parts of the resume that Hennessee Group claimed to have verified.

- Hennessee Group had not in fact conducted "five layers of due diligence" on the Bayou Fund, its managers, or its auditor as Hennessee Group claimed to have done when it recommended that DePauw invest $3.25 million in the Fund.

The work of investing DePauw's Endowment necessarily takes place on a national

stage, with the involvement of professionals located all over the country, and with the Investment

Committee members meeting often by telephone as well as face-to-face in Greencastle and

---

[7]  *United States v. Bayou Accredited Fund, LLC,* No. 05-Civ-7722 (S.D.N.Y. Sept. 1, 2005).

[8]  *See, e.g.,* Gretchen Morgenson, "Clues To A Hedge Fund's Collapse," *New York Times*, Sept. 17, 2005, Ex. C.

elsewhere.  There can be no question, however, that the focal point of all this activity is the University, located in Greencastle.

For the reasons that follow, DePauw is entitled to hold the defendants accountable in this Court for the consequences of their behavior.

## III.    DISCUSSION

### A.    This Court Has Personal Jurisdiction Over Defendants Because 15 U.S.C. § 78aa Provides For Nationwide Service Of Process And Defendants Have Minimum Contacts With The United States.

DePauw need only make a *prima facie* showing that the defendants are subject to personal jurisdiction, and DePauw is entitled to the benefits of its allegations and of any conflicts in evidentiary submissions.  *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003).  The absence of factual allegations in the original complaint to support personal jurisdiction is not material because a complaint need not include facts alleging personal jurisdiction.  *Id.*; *Steel Warehouse of Wis., Inc. v. Leach*, 154 F.3d 712, 715 (7th Cir. 1998).  That said, the evidence of jurisdictional contacts in this case is overwhelming.

As the defendants acknowledge, because DePauw alleges a claim arising under Section 10(b) of the Securities Exchange Act of 1934 (the "Act") and Rule 10b-5 promulgated under it, the defendants are subject to nationwide service of process, and the Act "provides a basis for exercising personal jurisdiction" over them.  (Defs. Resp. at 7.)[9]

---

[9]    15 U.S.C. § 78aa provides, in relevant part, as follows:

> The district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder. Any criminal proceeding may be brought in the district wherein any act or

- 11 -

The Seventh Circuit applies a "national-contacts" test in cases such as this one, where a federal statute provides for nationwide service of process.  *See United Rope Distribs. v. Seatriumph Marine*, 930 F.2d 532, 534 (7th Cir. 1991).  To satisfy the national-contacts test, "due process requires only that the defendant possess sufficient contacts with the United States." *Miller Pipeline Corp. v. British Gas*, 901 F. Supp. 1416, 1421-22 (S.D. Ind. 1995) (citation omitted).

Here, the defendants obviously cannot dispute that they have minimum contacts with the United States.  Hennessee Group is a limited liability company organized under the laws of New York with its principal place of business in New York.  (Defs. Brf. at 2.)  Gradante and Lee are the Managing Principals of Hennessee Group, and both are residents of New York.  (*Id.*)

The defendants' attempts to undermine the continuing vitality of the "national-contacts" test in the Seventh Circuit are unavailing.  The test has been consistently affirmed and repeatedly applied in decisions of the Seventh Circuit and the district courts.  *See, e.g., Diamond Mortgage Corp. of Ill. v. Sugar*, 913 F.2d 1233, 1244 (7th Cir. 1990), *cert. denied*, 498 U.S. 1089 (1991) (holding that where federal statute provides for nationwide service of process, contacts with state are irrelevant because defendant had sufficient contacts with United States); *United States v. De Ortiz*, 910 F.2d 376, 382 (7th Cir. 1990) (holding due process requires only sufficient contacts with the United States as a whole rather than with any particular state where statute provides nationwide service of process); *Lisak v. Mercantile Bancorp, Inc.*, 834 F.2d 668,

---

transaction constituting the violation occurred.  Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.

671-72 (7th Cir. 1987) (holding that where federal statute provides for nationwide service, the Due Process Clause does not upset Congress's decision); *Fitzsimmons v. Barton*, 589 F.2d 330, 333 n.4 (7th Cir. 1979) (holding that national-contacts analysis applies where Congress has authorized nationwide service of process); *Zurich Capital Mkts., Inc. v. Coglianese,* 388 F. Supp. 2d 847, 857 (N.D. Ill. 2004) ("Because [section 78aa] provides for nationwide service of process, it confers personal jurisdiction in federal court over defendants with minimum contacts with the United States."); *Miller Pipeline Corp.*, 901 F. Supp. at 1421-22; *Czechorski v. Executive Telecard, Ltd.*, 95-C-2388, 1995 WL 549946, at *2 (N.D. Ill. Sept. 8, 1995) (holding that where 15 U.S.C. § 78aa provides for nationwide service of process, the court has personal jurisdiction over defendant if there is a nexus between defendant and the United States).

Until the Seventh Circuit or the United States Supreme Court overrules the national-contacts test, it remains controlling in this circuit. Accordingly, because the defendants have minimum contacts with the United States, they are subject to personal jurisdiction in this forum. The Court should deny the defendants' motion on that basis alone.

**B.** **This Court Also Has Personal Jurisdiction Over Defendants Because They Purposely Availed Themselves Of The Benefits And Protections Of Doing Business In Indiana, And The Exercise Of Personal Jurisdiction Is Reasonable.**

Even without the benefit of nationwide service of process under DePauw's federal securities claim, the defendants would still be subject to personal jurisdiction in this Court because they have purposely chosen to do business in Indiana, having directed continuous and systematic activities toward the state in that connection, and therefore have purposefully availed themselves of the benefits and protections of Indiana law. Moreover, this Court's exercise of

personal jurisdiction over the defendants is unquestionably reasonable under the circumstances of this case.

In the absence of a federal statute authorizing nationwide service of process, the Court must determine if a court of the state in which the district court sits would have personal jurisdiction over the defendant. *Speedster Motorcars of Cent. Fla., Inc. v. Ospeck*, No. 1:04-CV-63, 2004 WL 2745051, at *3 (S.D. Ind. Oct. 6, 2004). Indiana's long-arm statute allows Indiana courts to exercise personal jurisdiction to the full extent allowed by the United States Constitution. *See* Indiana Trial Rule 4.4(A) ("In addition, a court of this state may exercise jurisdiction on any basis not inconsistent with the Constitutions of this state or the United States"); *Glasscock v. Corliss*, 823 N.E.2d 748, 755 n.4 (Ind. Ct. App. 2005), *reh'g denied, trans. denied* ("Indiana's 'long-arm' jurisdiction now extends to the limits permitted by the Due Process Clause.").

Due process requires that a non-resident defendant have minimum contacts with the forum. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The United States Supreme Court has recognized two types of personal jurisdiction – specific and general. In this case, this Court has *specific* jurisdiction, which exists when the defendant's contacts with the forum are related to the controversy and those contacts reach a minimum threshold of purposeful availment. *NUCOR Corp. v. Aceros Y Maquilas de Occidente, S.A. de C.V.*, 28 F.3d 572, 580 (7th Cir. 1994). "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (citation omitted). If the "cause of action at issue 'arises out of or relates to' those contacts, a court may properly assert personal jurisdiction, even if those contacts are 'isolated or sporadic.'" *Red Wing Shoe Co., Inc. v.*

- 14 -

*Hockerson-Halberstadt, Inc.*, 148 F.3d 1355, 1359 (Fed. Cir. 1998) (quoting *Burger King*, 471

U.S. at 472-73). Once the Court has determined that sufficient minimum contacts exist, the

Court must determine the reasonableness of subjecting the defendant to the jurisdiction of the

forum. *WorldWide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980).

> 1. **Defendants' Substantial Contacts with Indiana Reveal That They Have Purposely Availed Themselves of the Benefits and Protections of Doing Business in Indiana.**

It is often enough to support jurisdiction that a defendant has entered into a

contract with a party in the forum state. Here, however, the defendants have done much more.

They cultivated and maintained a long-term business relationship that has involved contract

negotiations, execution of the Investment Advisory Agreement, periodic payments as required

under the Agreement, and scores of communications purposefully directed to Greencastle in

furtherance of the Agreement, at least one of which contained representations that were

demonstrably false and that were relied upon, and intended to be relied upon, by this Indiana

plaintiff to invest millions of dollars in a hoax. As such, the defendants' contacts with Indiana

were systematic, not random; purposeful, not fortuitous; and continuous, not attenuated. The

defendants can claim neither surprise nor unfairness that they are being made to answer for the

consequences of behavior that was targeted toward and caused injury in Indiana.

By entering into a long-term contractual relationship with an Indiana resident, a

party purposefully avails itself of the privilege of conducting business in Indiana. *See Burger*

*King*, 471 U.S. at 473 ("[W]e have emphasized that parties 'who reach out beyond one state and

create continuing relationships and obligations with citizens of another state' are subject to

regulation and sanctions in the other State for the consequences of their activities."), *quoting*

*Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 647 (1950); *Purdue Research*, 338 F.3d at 785

- 15 -

(finding personal jurisdiction over defendant's predecessor to cooperative research agreement because the agreement clearly "envisioned continuing and wide-reaching contacts" between the parties); *Woodmar Coin Ctr., Inc. v. Owen*, 447 N.E.2d 618, 621 (Ind. Ct. App. 1983) (holding defendant "purposely availed himself of the benefits and responsibilities of doing business in this State by soliciting, negotiating and forming a contract with an Indiana resident").

It is also well established that electronic and mail communications may establish minimum contacts, especially if those communications relate to an interstate commercial contract. *See Heritage House Rests., Inc. v. Cont'l Funding Group, Inc.*, 906 F.2d 276, 283 (7th Cir. 1990) (finding that defendant "created a relationship which is naturally based on telephone and mail contacts rather than physical presence, and it should not be able to avoid jurisdiction based on that distinction"); *Yates-Cobb v. Hays*, 681 N.E.2d 729, 733 (Ind. Ct. App. 1997) (finding four letters and several telephone calls by defendant were highly relevant to jurisdictional analysis as direct contacts with Indiana ); *cf. Int'l Med. Group, Inc. v. Am. Arbitration Ass'n, Inc.*, 312 F.3d 833, 845 (7th Cir. 2002) (holding contacts of a defendant's agents are attributable to the defendant for purposes of evaluating minimum contacts). Here, the defendants' directed scores of communications to DePauw, each related to the subject of the Investment Advisory Agreement. It is telling that the defendants' evidentiary submissions regarding their contacts with Indiana fail to mention their stacks of e-mails to DePauw, which are at the core of DePauw's Complaint. Indeed, those e-mails still reside where Hennessee Group sent them—on DePauw's e-mail server in Greencastle—even now. (Speller Decl. ¶ 4.)

This court's decision in *Resuscitation Technologies, Inc. v. Continental Health Care Corp.*, No. 96-1457, 1997 WL 148567 (S.D. Ind. Mar. 24, 1997) (McKinney, J.), is instructive. In that case, plaintiff initiated contact with defendant via a solicitation at the

- 16 -

plaintiff's web site.  *Id.* at *1.  Defendant responded to plaintiff's solicitation by e-mail.  *Id.*

Thereafter, the parties corresponded by e-mail, telephone, and regular mail, and their

communications included some eighty e-mail messages.  *Id.* at *2.  The parties met face-to-face

(though never in Indiana), and negotiated for several months.  *Id.*  After negotiations soured,

plaintiff filed an action in the Southern District of Indiana, seeking a declaratory judgment that

no contract had been formed.  *Id.* at *3.

  Defendant moved to dismiss for lack of personal jurisdiction.  *Id.*  Defendant

argued that it neither owned property nor conducted business in Indiana; moreover, defendant

argued that because plaintiff first solicited defendant's business, defendant had not purposefully

availed itself of the privilege of doing business in Indiana, and therefore the exercise of

jurisdiction would contravene the Due Process Clause.  *Id.* at *4-5. Despite defendant's argument

that the plaintiff had initiated the contact, this Court concluded:

> The parties continued to communicate extensively through electronic mail, the
> goal of which was to combine their resources to form a new company for
> purposes of funding the development of [plaintiff's] medical device technology. A
> continuing and long-term relationship was contemplated, as indicated by the non-
> binding letter of intent dated August 21, 1996.  Even though their face-to-face
> meetings were out of state, the negotiations and discussions during those meetings
> were directed towards setting in motion a business operation that would have a
> significant commercial impact on Indiana. This Court finds that the intended
> object of the contacts by [defendant] with [plaintiff] and with the State of Indiana
> were to transact business in Indiana.

*Id.* at *5.

  The issue, the Court noted, is not "'who started it.'  Neither is the matter disposed

of by the fact that no defendant ever set foot in Indiana.  The 'footfalls' were not physical, they

were electronic.  They were, nonetheless, footfalls.  The level of Internet activity in this case was

significant." *Id.* at *5.  While "one or two inquiries about some Indiana goods or services would

- 17 -

not support local jurisdiction," here the "electronic mail messages were numerous and continuous." *Id.* at *6. Because defendants "reached beyond the boundaries of their own states to do business in Indiana, it is not unreasonable for them to be haled into an Indiana forum." *Id.*

Just so here, in spades. E-mail was the parties' primary means of communicating, and each e-mail that was sent to or from DePauw's server in Greencastle constitutes a "footfall" within the State that supports the exercise of personal jurisdiction over those who did business by sending or receiving it. *See also Intercon, Inc. v. Bell Atl. Internet Solutions, Inc.*, 205 F.3d 1244 (10th. Cir. 2000) (holding that because defendant continually routed emails through plaintiff's email server in Oklahoma, personal jurisdiction over defendant was proper); *EDIAS Software Int'l v. BASIS Int'l*, 947 F. Supp. 413 (D. Ariz. 1996) (finding that personal jurisdiction existed on the basis of electronic messages that caused injury in the forum state); *Hall v. LaRonde*, 56 Cal. App. 4th 1342 (Cal. Ct. App. 1997) (holding defendant's act of sending multiple emails to plaintiff in California was enough contact with California for exercise of personal jurisdiction over defendant).

Other aspects of the parties' course of dealing underscore the defendants' purposeful availment of the privilege of doing business in Indiana. Pursuant to the Agreement, Hennessee Group received annual payments from DePauw for its "continuous and ongoing performance monitoring" of DePauw's investment portfolio. (Cmplt., Ex. A at 2.) The Agreement further provides that representatives of Hennessee Group "will also be available to confer" with DePauw periodically. (*Id.*) DePauw's payments were based on the total amount of investments DePauw made in hedge funds that Hennessee Group recommended. (Cmplt., Ex. A at 3.) In other words, the more persuasive Hennessee Group was, the more money it made. As the Supreme Court discussed in *Burger King*, the creation of such continuing obligations

- 18 -

between the contracting parties reveals the extent to which the defendants have availed

themselves of the privilege of conducting business in Indiana. *Burger King*, 471 U.S. at 476; *see

also Purdue Research*, 338 F.3d at 785.

   **2.  The Exercise of Personal Jurisdiction Over Defendants Is Reasonable.**

   Because the defendants have substantial contacts with this forum, they can escape

jurisdiction only by making a compelling showing that forcing them to litigate in this forum

would violate traditional notions of fair play and substantial justice. *Burger King*, 471 U.S. at

476.

   The defendants' arguments do not approach the required showing. They have

submitted no evidence to show that forcing them to litigate in this judicial district would violate

traditional notions of fair play and substantial justice. Though it is always somewhat

burdensome to defend a lawsuit away from home, it is seldom a burden that violates due process,

and certainly is not in this instance. *See Burger King*, 471 U.S. at 474 (explaining that modern

transportation and communications mean it is usually not unfair or too burdensome to require a

party to defend itself in a state where it engages in economic activity); *Bd. of Trustees, Sheet

Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1037 (7th Cir. 2000)

("Easy air transportation, the rapid transmission of documents, and the abundance of law firms

with nationwide practices, make it easy these days for cases to be litigated with little extra

burden in any of the major metropolitan areas."). Indeed, the defendants chose Florida counsel

to lead their defense, underscoring the Seventh Circuit's point in the case just cited.

   In sum, the defendants had substantial contacts with Indiana, having purposefully

availed themselves of the privilege of doing business here and having directed hundreds of

communications here over the course of a nearly two-year relationship in which they made

significant money and DePauw, in reliance on their advice, lost millions.  This Court's exercise

of personal jurisdiction under the circumstances of this case is entirely consistent with traditional

notions of fair play and substantial justice.

### C. Venue Is Proper In The Southern District Of Indiana Because A Substantial Portion Of The Events Giving Rise To This Action Occurred In This District.

The defendants also move to dismiss pursuant to Rule 12(b)(3) of the Federal

Rules of Civil Procedure based on their claim that venue is not proper in this forum.  On that

motion, the Court is obliged to accept DePauw's unchallenged allegations as true and to resolve

any conflicts in the parties' evidentiary submissions in DePauw's favor.  *See Moore v. AT&T*

*Latin Am. Corp.*, 177 F. Supp. 2d 785, 788 (N.D. Ill. 2001).

The same facts that establish personal jurisdiction over the defendants establish

that venue is appropriate in this forum.  In this case, venue is governed by 15 U.S.C. § 78aa:

> Any criminal proceeding may be brought in <u>the district wherein any act or
> transaction constituting the violation occurred</u>. Any suit or action to enforce any
> liability or duty created by this chapter or rules and regulations thereunder, or to
> enjoin any violation of such chapter or rules and regulations, may be brought in
> any such district or in the district wherein the defendant is found or is an
> inhabitant or transacts business

*Id.* (emphasis added).  For the Court to find that venue is appropriate under Section 78aa, "all

that is required is but one act within the forum district which represents more than an immaterial

part of the allegedly illegal events." *Bath Indus., Inc. v. Blot*, 427 F.2d 97, 114 (7th Cir. 1970).

A single act committed within the district in furtherance of a scheme to defraud is sufficient to

confer venue.  *Firemen's Annuity & Ben. Fund of Chicago v. Union Planters Nat'l Bank*, No. 87-

C-106, 1987 WL 4990, at *2 (N.D. Ill. June 1, 1987).  The act need not constitute the core of the

violation; nor need it be illegal, as long as it was more than an immaterial part of the alleged

violation.  *Id.*; *see also Lefever v. Vickers*, 613 F. Supp. 352, 353 (D. Colo. 1985); *S-G*

- 20 -

*Securities, Inc. v. Fuqua Inv. Co.*, 466 F. Supp. 1114, 1121 (D. Mass. 1978); *Burkhart v. Allison Realty Trust*, 363 F. Supp. 1286, 1292 (N.D. Ill. 1973).

        Consistent with this body of law, "venue will be sustained in a securities case where a defendant causes false or misleading information to be transmitted into a judicial district, even if the defendant never has been physically present in that district." *Firemen's Annuity & Ben. Fund of Chicago*, 1987 WL 4990, at *2; *Como v. Commerce Oil Co., Inc.*, 607 F. Supp. 335, 341-42 (S.D. N.Y. 1985); *Oxford First Corp. v. PNC Liquidating Corp.*, 372 F. Supp. 191, 197 (E.D. Pa. 1974). Any non-trivial act in the forum district that facilitates the securities law violation is adequate to establish venue under section 78aa. *Marberg v. Chancellor*, No. 93-C-6739, 1994 WL 48600, at *2 (N.D. Ill. Feb. 16, 1994) (citation omitted).

        In this case, Hennessee Group sent multiple e-mails to Greencastle concerning the Bayou Fund, starting with the "write-up" of Hennessee Group's investment recommendation on December 8, 2003, and continuing with monthly investment-performance reports, all of which were false, in some cases demonstrably so based on information that was publicly available and that experts such as the defendants knew to look for. As such, venue is clearly appropriate in this district. *See, e.g., Lefever v. Vickers*, 613 F. Supp. 352, 353 (D. Colo. 1985) (finding venue existed where defendant wrote letter to stock transfer service that operated in forum's district; transfer service followed instructions in the letter, which resulted in an illegal benefit to defendant); *Savin v. CSX Corp.*, 657 F. Supp. 1210, 1215 (S.D.N.Y. 1987) (finding venue proper in forum where members of plaintiff class received allegedly fraudulent material). That is the short answer to the defendants' venue arguments.

        Other activities in this district buttress the conclusion that venue is appropriate here, including but not limited to: placing telephone calls to McGuire in Greencastle; mailing

letters and documents to Indiana; cultivating and maintaining a two-year business relationship under which Hennessee Group agreed to provide investment recommendations and portfolio monitoring for an Indiana client; charging and accepting fees from an Indiana client for services to be provided to the client, with the fees increasing based on Hennessee Group's ability to persuade the client to follow its recommendations; telling the Indiana client's Chief Investment Officer to consider Hennessee Group "an extension of [her] office;" requesting and then initiating direct communications with the members of the Indiana client's Investment Committee; and offering to attend and then scheduling attendance at the Investment Committee's meeting in Greencastle.  *See, e.g., City of Harrrisburg v. Bradford Trust Co.*, 621 F. Supp. 463, 467-68 (M.D. Pa. 1985) (holding defendant misrepresented facts to plaintiff over telephone lines; plaintiff resided in forum's district); *Young v. First Kentucky Bancorp, Inc.*, No. 94-C-3172, 1994 WL 710775, at *1 (N.D. Ill. Dec. 16, 1994) (holding venue appropriate because defendants solicited plaintiff by sending correspondence to plaintiff's home); *S.E.C. v. Nappy*, 1994 WL 420937, at *2 (holding that trading options in district via telephone from New York sufficient to establish venue in district court); *Bourassa v. Desrochers*, 938 F.2d 1056, 1057 (9th Cir. 1991) (holding single phone call from Canada to California during twenty-six year lead up to lawsuit was adequate "act or transaction" regarding alleged securities claim to make venue appropriate).

In sum, the facts demonstrate that not just one, but a substantial portion, of the acts on which the alleged violation is based—including in particular Hennessee Group's transmission to Greencastle of the Bayou Fund investment recommendation that forms the core of DePauw's case—occurred in or were directed toward the Southern District of Indiana.  Venue is proper.

**D.** **New York Is Not A "Clearly More Convenient" Forum Than Indiana, And The Court Should Respect DePauw's Choice Of This Equally (We Submit, More) Convenient Forum.**

Finally, if the Court concludes that the defendants are subject to jurisdiction and that venue is proper in this forum, then the defendants ask the Court to transfer this action to the Southern District of New York pursuant to 28 U.S.C. § 1404(a). Section 1404(a) provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

Courts generally consider three factors in deciding whether to transfer a case under section 1404: the plaintiff's choice of forum, the convenience of the parties and witnesses, and the interests of justice. *Roberts & Schaefer Co. v. Merit Contracting, Inc.*, 99 F.3d 248, 254 (7th Cir. 1996), *cert. denied*, 520 U.S. 1167 (1997). The movants – the defendants in this case – have "the burden of establishing, by reference to particular circumstances, that the transferee forum is <u>clearly more convenient</u>." *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219-20 (7th Cir. 1986) (emphasis added). A transfer should not be granted if it will merely shift convenience from one party to another. *K&F Mfg. Co. v. W. Litho Plate & Supply Co.*, 831 F. Supp. 661, 664 (N.D. Ind. 1993).

The defendants have not carried that burden here, and they cannot.[10]

**1.** **DePauw's Choice of This Forum Is Entitled to Substantial Weight.**

On a motion to transfer under section 1404(a), "[t]here is a strong presumption in favor of the plaintiff's choice of forum." *Zelinski v. Columbia*, 335 F.3d 633, 643 (7th Cir. 2003); *Simon v. Whichello,* No. 1:05-CV-333, 2005 WL 3093568, at *4 (N.D. Ind. Nov. 17, 2005). This presumption is especially applicable when the forum is the plaintiff's home.

---

[10] DePauw notes that the defendants' arguments acknowledge that this case will be litigated, not arbitrated.

- 23 -

*Lighthouse Carwash Sys., LLC v. Illuminator Bldg. Co., LLC*, No. 1:04-CV-0962, 2004 WL 2750251, at *3 (S.D. Ind. Sept. 28, 2004); *Kendall U.S.A., Inc. v. Cent. Printing Co.*, 666 F. Supp. 1264, 1268 (N.D. Ind. 1987). In fact, a plaintiff's choice of forum should "rarely be disturbed" unless the balance weighs "strongly" in the defendant's favor. *In re Nat'l Presto Indus., Inc.*, 347 F.3d 662, 663-64 (7th Cir. 2003); *Lighthouse Carwash Sys., LLC*, 2004 WL 2750251, at *3; *Vandeveld v. Christoph*, 877 F. Supp. 1160, 1167 (N.D. Ill. 1995) (citation omitted). Such deference permeates the section 1404 inquiry, tipping the scales in the plaintiff's favor from the outset. *Lighthouse Carwash Sys., LLC*, 2004 WL 2750251, at *3.

The defendants assert without analysis that the presumption in favor of DePauw's choice of forum is undercut here because "the conduct giving rise to this action occurred in a different forum." (Defs. Br. at 18.) (*citing Kelley Buick of Atlanta v. TIG Ins. Co.*, No. 1:05-CV-271-TS, 2005 WL 323825, at *2 (N.D. Ind. Nov. 29, 2005)). The defendants' reliance on *Kelley Buick* is misplaced. [11] That is simply one of several cases that say that a plaintiff's choice of forum is entitled to less deference when the chosen forum is *neither* the plaintiff's home *nor* one that has a substantial connection to the cause of action. *See, e.g., Gemological Inst. of Am., Inc. v. Trang Thi-Dai Phan*, 145 F. Supp. 2d 68, 71 (D.D.C. 2001), *quoting DeLoach v. Philip Morris Co., Inc.*, 132 F. Supp. 22, 24 (D.D.C. 2000) (holding "although a plaintiff's choice of forum is ordinarily accorded a significant degree of deference, numerous cases in this Circuit recognize that such a choice receives substantially less deference where the plaintiffs, as here, neither reside in, nor have any substantial connection to, that forum"); *Gen. Instrument Corp. v. Mostek Corp.*, 417 F. Supp. 821, 823 (D. Del. 1976) ("Where the forum selected by plaintiff is

---

[11]    *Kelley Buick* is easily distinguishable on its facts. That was a suit for a declaratory judgment regarding an insurer's denial of coverage. Plaintiff was not a resident of the forum in which it sued. *Id.* Further, and also unlike here, <u>all</u> of the essential events associated with the claim occurred outside the forum. *Id.*

- 24 -

connected neither with the plaintiff nor with the subject matter of the lawsuit, meeting the burden of showing sufficient inconvenience to tip the 'balance' of convenience 'strongly in favor of defendant' will ordinarily be less difficult."), *cited in State Farm Mut. Auto. Ins. Co. v. Bussell*, 939 F. Supp. 646, 651 (S.D. Ind. 1996); s*ee also Beller v. MacDermid, Inc.*, No. 01-210, 2002 WL 31045377, at *5 (S.D. Ind. Sept. 9, 2002) (deferring to plaintiff's choice of forum where forum state was not his residence but was place where claim arose).

Further, and as discussed above, a substantial portion of the events giving rise to DePauw's claims occurred in or were directed toward this district. For nearly two years, Hennessee Group directed e-mails to DePauw's computer server in Greencastle, Indiana, with the intention that the information in them be read and relied upon by DePauw's Chief Investment Officer and DePauw's Investment Committee; it sent other communications direct to members of the Investment Committee, all of whom it understood were serving an Indiana institution and some of whom lived in Indiana themselves; it entered into a contract with and provided ongoing advice and services to DePauw and charged DePauw fees that increased the more DePauw relied on Hennessee Group's advice; and its violations of its obligations under the federal and Indiana securities laws and Indiana common law caused this Indiana institution to suffer losses that total in the millions of dollars. Without question, this forum has a substantial connection to the transactions at issue. Accordingly, the Court should recognize the strong presumption in favor of DePauw's choice of forum and respect DePauw's choice to have its claims adjudicated in this Court.

2.     **Defendants Have Not Met Their Burden of Establishing that the Southern District of New York Is Clearly More Convenient for Parties and Witnesses.**

Given the strong presumption in favor of DePauw's choice of forum, the burden on the defendants to demonstrate that New York is clearly more convenient for the parties and witnesses in this case is a heavy one.  And the defendants have not met it on either point.

Parties.  First, defendants have not shown that New York is clearly more convenient for the *parties*.  Defendants assert that because (a) they are located in New York and (b) the majority of their documents and the Bayou Fund's documents are in either New York or Connecticut, transfer would serve the convenience of the parties.[12]  (Defs. Brf. at 19.)

It is telling that the defendants focus solely on their own convenience in litigating this matter in arguing that transfer is warranted.  The fact that their primary witnesses are located in New York is not a compelling reason for transfer.  First, "the effect of a transfer cannot be a mere shift of inconveniences" among the parties. *Moore v. AT & T Latin Am. Corp.*, 177 F. Supp. 2d 785, 789 (N.D. Ill. 2001), *citing Promatek Med. Sys., Inc. v. Ergometrics, Inc.*, No. 89-C-6913, 1990 WL 19491, *4 (N.D. Ill. Feb. 15, 1990).  Merely making the litigation more convenient for one party is not a reason to transfer an action.  *See, e.g., Educ. Visions, Inc. v. Time Trend, Inc.*, No. 1:02-CV-1146, 2003 WL 1921811, at * (S.D. Ind. Apr. 17, 2003).

If this matter is transferred, DePauw would unquestionably be inconvenienced— unfairly so.  Most of its employees live here.  To the extent it matters (not much, as discussed

---

[12]  Defendants cite the likely appointment of a receiver for the Bayou Fund in the Southern District of New York as a reason for transfer.  (Defs. Brf. at 19.)  Indeed, a receiver has now been appointed.  So what?  This lawsuit involves DePauw's claims against Hennessee Group and its principals based on their having persuaded DePauw to invest millions in a fund that is now in receivership.  It is the defendants' misconduct that is at issue.  The receivership is a fact, but not one that requires much attention here.  For that matter, the facts surrounding the Bayou Fund managers' misdeeds in general will require little attention because the managers have pled guilty to multiple felonies and are headed to prison.  That the Bayou Fund was a complete scam is not at issue; it is conceded and well-documented.

below), the majority of the documents and other materials DePauw will use to establish its case are located in Indiana.  DePauw's counsel are in Indiana.  The defendants' primary counsel are in <u>Florida</u>.  It would be at least equally inconvenient – we submit more so – for DePauw if this matter were transferred to New York.

Defendants' assertions regarding the location of their documents are of little consequence.  The location of documents "is a small matter 'in these more modern days of photocopying, faxing and other electronic means of retrieval.'"  *Aearo Co. v. Bacou-Dalloz USA Safety, Inc.*, No. 1:03-CV-01406, 2004 WL 1629566, at *3 (S.D.Ind. July 21, 2004) (citing *Undertoe Software, Inc. v. Advanced Tracking Tech., Inc.*, No. 02-C-8065, 2002 WL 31890062, at *1 (N.D .Ill. Dec. 30 2002)).

Defendants' argument concerning the need for the subpoena power of the Southern District of New York is also unavailing.  In similar cases, courts have repeatedly rejected this argument because "parties may use Rule 45 of the Federal Rules of Civil Procedure to conduct discovery all over the United States."  *See, e.g.*, *JMC Tech. Group, Inc. v. EDM Sales & Supplies, Inc.*, No. 1:03-CV-0638, 2004 WL 392945, at *2 (S.D. Ind. Feb. 10, 2004) (denying section 1404(a) motion to transfer); *Buztronics, Inc. v. Theory3, Inc.*, No. 1:04-CV-1485, 2005 WL 1113873, at *4 (S.D. Ind. May 9, 2005) (same).

<u>Witnesses</u>.  Nor have the defendants carried their heavy burden to demonstrate that New York is clearly move convenient for the *witnesses* in this case.  They assert that "[a]ll of the Defendants, at least five of their primary witnesses and the majority of critical witnesses in the case are domiciled in New York and/or work at Hennessee Group's office in New York." (Defs. Brf. at 19.)  Defendants do not identify their five witnesses or state which ones are their own employees.  This is important because courts assume "that the parties will be sufficiently

- 27 -

motivated to have their own employees or other allies appear for trial wherever it might take place." *See, e.g., FUL Inc. v. Unified Sch. Dist. No. 204*, 839 F. Supp. 1307, 1311 (N.D. Ill. 1993); *Greene Mfg. Co. v. Marquette Tool & Die Co.*, No. 98-Civ-1295, 1998 WL 395155, *3 (N.D. Ill. July 9, 1998); J*MC Tech. Group, Inc.*, 2004 WL 392945, at *2.

These vague references to unidentified witnesses are similar to those in *Automotive Finance Corp. v. Farmer*, No. 02-0212, 2002 WL 1633697 (S.D. Ind. July 19, 2002). In that case, movant asserted that all of its essential witnesses were located in Texas. *Id.* at *4. The Court gave that no weight: "[Movant] has not submitted a witness list [or] made any showing that potential witnesses will be unable to participate in a trial in Indiana. . . . [Movant] simply has not provided enough information for the Court to find that a Texas forum would be 'clearly more convenient' for either the witnesses or the judicial system." *Id.*; *see also Beller*, 2002 WL 31045377, at *6 (denying section 1404(a) motion where party "failed to identify any non-party witnesses who would be more readily available for trial in Connecticut than in Indiana"). Moreover, to the extent that the defendants mean to suggest that the Bayou Fund's principals will be necessary or even important witnesses, DePauw disagrees. As noted, the key Bayou people are headed to prison. They have confessed, and the facts of their scam are documented. Discovery and proof in this case will focus on what the <u>defendants</u> knew and did. The witnesses concerning those matters are, for the most part, employees of DePauw and employees of Hennessee Group.

In sum, the defendants have not identified any witnesses whose testimony is not equally accessible here as in New York, much less shown that New York is clearly more convenient.

3. **The Interests of Justice Favor Keeping This Matter in the Southern District of Indiana.**

In weighing the interests of justice on a section 1404(a) motion to transfer, courts consider the efficient administration of the court system rather than the private interests of the litigants. *Anchor Walls Sys., Inc. v. R&D Concrete Prods., Inc.*, 55 F. Supp. 2d 871, 875 (N.D. Ill. 1999). The defendants point to five factors in this regard that they say favor transfer to New York: (1) the plaintiff's choice of forum, (2) the situs of material events, (3) the ease of access to sources of proof, (4) the availability of compulsory process for the attendance of unwilling witnesses; and (5) the convenience of the parties and their ability to bear the expenses of litigation in a particular forum. (Defs. Brf. at 20.)

Many of these factors have been addressed above, and, as demonstrated, weigh heavily against transfer. First, DePauw's choice of forum is given substantial deference; the plaintiff's choice is rarely overturned where, as here, the forum is the plaintiff's home. Second, the material events at the core of DePauw's claims occurred in or were directed to this district. (*See* discussion at pp. 3-11, 14-18, 20-22, 23-25, *supra*.) Third, the sources of proof are located in both Indiana and New York, and, as discussed above, the parties may utilize Rule 45 to obtain any testimony and materials they may need. Fourth, as also discussed above, the defendants have failed to identify any non-employee witness who is not otherwise allied with them and whose attendance defendants may need to compel. Equally important, the proof in this case will focus entirely on the <u>defendants'</u> conduct. The facts surrounding the Bayou Fund's collapse are admitted and well-documented. Finally, defendants blithely assert without any support that DePauw "is an educational institution that will not suffer financial hardship by litigating this action" in New York. (Defs. Brf. at 21.) DePauw submits that, although all parties in this case

- 29 -

are sophisticated, one is a not-for-profit university and the others are financial professionals who

hold themselves out to the world as the leading experts in what are among the least understood

investment vehicles on the market. If any financial hardship is to be borne, it should be by the

defendants, who directed fraudulent recommendations to and caused harm in Indiana, rather than

DePauw, which relied upon the defendants' advice and whose financial losses will impact its

academic programs and student body rather than its profit margin.

Defendants next point to three "public interest factors" and argue that they also

favor transfer. (Defs. Brf. at 20-22.) These include: (1) the community's relationship to the

issue of the litigation, (2) the court's familiarity with the applicable law, and (3) the congestion of

the respective court dockets. Each of these also favors keeping this matter in Indiana.

The Southern District of Indiana and Greencastle in particular have a strong

interest in this litigation – the loss by DePauw University's Endowment of millions of dollars as

a result of the defendants' misconduct. Indiana certainly has an interest in adjudicating this

litigation because it involves an injury to a citizen's endowment. DePauw maintains an

Endowment to strengthen the University's ability to fund scholarships and academic programs, to

provide diverse and expanding educational opportunities, and in general to enhance the quality of

education for its students, most of whom are Hoosiers. (Cmplt. ¶ 6.) If not recovered, DePauw's

losses will impact its ability to fulfill these objectives. Defendants' counter-argument that "none

of the critical events are connected to [this] district" (Defs. Brf. at 21) is demonstrably not true.

They had deliberate, repeated, continuous and systematic contacts with DePauw in this district

over the course of the parties' two-year relationship. The community's strong interest in the

matter at issue clearly favors keeping this case in the Southern District of Indiana.

On the question of applicable law, this case involves claims under the Indiana Securities Act, the Securities Exchange Act, and the common law of Indiana. The defendants do not dispute "the applicability of Indiana law to any of Plaintiff's claims." (Defs. Brf. at 21.) The defendants correctly note that the Investment Advisory Agreement provides that it is to be construed in accordance with the laws of the State of New York. (*Id.*; Complaint, Ex. A, §XIII.) Since there is no ambiguity in the Agreement, however, its construction is not at issue. Even if there were some issue of contract construction, moreover, this Court is obviously capable of addressing it. *See Preussag Int'l Steel Corp. v. Ideal Steel & Builders' Supplies, Inc.*, No. 03-C-6643, 2004 WL 783102, at *7 (N.D. Ill. Jan. 21, 2004) ("We find this argument less persuasive than other considerations especially because this case involves basic breach of contract and *quantum meruit* claims that we are confident any federal judge can properly and easily adjudicate."); *Stanley v. Marion*, No. 04-C-514, 2004 WL 1611074, at *4 (N.D. Ill. July 16, 2004) (holding "where the law in question is neither complex nor unsettled, the interests of justice remain neutral between competing courts."); *Amoco Oil Co. v. Mobil Oil Corp.*, 90 F. Supp. 2d 958, 962 (N.D. Ill. 2000) (finding that "contract law is not particularly complex" and is well within the comprehension of a foreign forum).

Importantly, the Agreement does <u>not</u> provide that any *claims* based upon or related to the Agreement are to be governed by New York law. This Court, sitting in Indiana and addressing questions of Indiana law every day, is clearly better qualified to address DePauw's claims under the Indiana Securities Act and Indiana common law. Admittedly, both this Court and the Southern District of New York are competent to address questions of federal law. *See* Wright & Miller, Federal Practice & Procedure § 3854 ("In federal question cases, in which federal law applies . . . all federal judges are adept in interpreting federal law.").

- 31 -

Finally, based on the 2005 docket statistics for the respective courts, the average number of cases pending before each judge in the Southern District of Indiana (537) is over 150 cases less than the average number pending before each judge in the Southern District of New York (689).  *See* Ex. D, United States District Court Judicial Caseload Profile.  As such, this factor as well weighs in favor of the Southern District of Indiana.  Accordingly, the balance of factors regarding the interests of justice favor keeping this matter in the Southern District of Indiana.

In sum, the defendants have failed to carry their heavy burden of demonstrating that New York is clearly a more convenient forum than Indiana.  We submit that the contrary is true.  Giving due deference to DePauw's choice of forum and recognizing that the balance of factors weighs in favor of keeping this proceeding in the Southern District of Indiana, this Court should deny the defendants' motion to transfer.

## IV.   CONCLUSION

This Court has personal jurisdiction over the defendants because 15 U.S.C. § 78aa provides for nationwide service of process and the defendants have minimum contacts with the United States.  Even apart from that statute, this Court has personal jurisdiction over the defendants because they have the requisite minimum contacts with Indiana, and the exercise of jurisdiction over them is not unreasonable.  The same facts that establish personal jurisdiction also demonstrate that venue is proper in this Court.  A substantial part of the events giving rise to DePauw's claims occurred in or were directed toward Indiana and caused injury in the Southern District.  Finally, the defendants have not carried and cannot carry the heavy burden of demonstrating that New York is a clearly more convenient venue than Indiana for litigating this dispute.  Accordingly, the Court should deny the defendants' motion to dismiss or transfer in all respects.

Respectfully submitted,

/s/ David K. Herzog
David K. Herzog
Matthew T. Albaugh
BAKER & DANIELS LLP
300 N. Meridian Street, Suite 2700
Indianapolis, IN  46204-1782
(317) 237-0300
(317) 237-1000 (fax)
david.herzog@bakerd.com
matthew.albaugh@bakerd.com

Dated:  January 20, 2006

*Attorneys for Plaintiff, DePauw University*

*Document No. 4290414*

- 33 -

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that on the 20th day of January, 2006, a copy of the foregoing *DePauw's Opposition To Defendants' Motion To Dismiss Or Transfer* was electronically filed. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Bennett Falk
Brian Amery
Mathew Wolper
BRESSLER, AMERY & ROSS, P.C.
2801 SW 149th Avenue, Suite 300
Miramar, Florida 33027

In addition to electronic service, a copy of the foregoing *DePauw's Opposition to Defendants' Motion to Dismiss or Transfer* was hand-delivered to the following counsel on the 20th day of January, 2006:

Lee B. McTurnan
Wayne C. Turner
Anne L. Cowgur
MCTURNAN & TURNER
2400 Market Tower
10 West Market Street
Indianapolis, Indiana 46204

/s/ Matthew T. Albaugh
Matthew T. Albaugh