# EXHIBIT A

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## TERRE HAUTE DIVISION

| | |
|---|---|
| DEPAUW UNIVERSITY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) CASE NO: 2:05-cv-0249-RLY-WGH |
| HENNESSEE GROUP LLC, | ) |
| CHARLES GRADANTE, and | ) |
| E. LEE HENNESSEE, | ) |
| | ) |
| Defendants. | ) |

## DECLARATION OF CARLA C. MCGUIRE

Carla C. McGuire states:

1.      I am the Chief Investment Officer of DePauw University ("DePauw" or "the University"), the plaintiff in the above-captioned case. I have held that position since September 15, 2003. I have personal knowledge of the facts stated in this Declaration and am competent to make this Declaration.

2.      DePauw has segregated certain funds into an endowment ("the Endowment") through which the University makes investments. DePauw seeks to invest these funds wisely and to manage the investments prudently so as to strengthen the University's ability to fund scholarships and academic programs, to provide diverse and expanding opportunities for current and prospective students, and in general to enhance the quality of education available at DePauw. I manage the Endowment on a day-to-day basis. A committee of DePauw's Board of Trustees, known as the Investment Committee, oversees the Endowment and my work as Chief Investment Officer. Northern Trust Bank serves as custodian of the Endowment's accounts.

3.      In my position as DePauw's Chief Investment Officer, I am both an employee and an officer of DePauw. I receive a salary from DePauw and, although I am not an Indiana resident, I pay income taxes to the State of Indiana as a result of my employment. I share an administrative assistant, Sue Brown, who works on the campus of DePauw in Greencastle, Indiana. I travel extensively for DePauw in connection with my work as Chief Investment Officer, including numerous trips to DePauw's campus in Greencastle, Indiana.

4.      DePauw has sometimes engaged the services of independent advisors to assist the University in making and managing investments. One such advisor is Hennessee Group LLC ("Hennessee Group"), one of the defendants in the above-captioned case.

5.     DePauw's relationship with Hennessee Group began prior to my joining DePauw. The relationship was originally formed through Jerry Burroughs ("Burroughs"), DePauw's former Chief Investment Officer, and Judson Green ("Green"), the Chairman of DePauw's Investment Committee. I am informed that, following several meetings with Burroughs, representatives of Hennessee Group made a presentation to four members of DePauw's Investment Committee on May 30, 2003.

6.     On June 11, 2003, Charles Gradante, one of the Managing Principals of Hennessee Group and a defendant in the above-captioned case ("Gradante"), sent a letter to Burroughs at his office at One Indiana Square, Suite 2550, Indianapolis, Indiana 46204, enclosing two copies of a proposed investment advisory agreement for Burroughs's "review and signature." A true and accurate copy of such letter is attached hereto as Exhibit 1. DePauw sent the proposed investment advisory agreement to outside counsel, but it did not enter into an agreement with Hennessee Group at that time.

7.     After I became DePauw's Chief Investment Officer, Green directed me to meet with representatives of Hennessee Group. I did so, spending several hours talking with representatives of Hennessee Group in their offices in New York City and reviewing their due diligence materials concerning various hedge funds. Based on my discussions and review, I advised DePauw to enter into a relationship with Hennessee Group to secure the benefit of Hennessee Group's expertise and experience in making and managing investments in hedge funds. In my judgment and, I believe, the judgment of DePauw's Investment Committee, DePauw did not have the expertise or the resources necessary to perform the kind of due diligence that Hennessee Group claimed to be able to perform, or to evaluate the merits of various hedge fund investments as Hennessee Group claimed to be able to do.

8.     In or about the week of November 10, 2003, on behalf of DePauw, I met with managers and other representatives of approximately twelve hedge funds that Hennessee Group had recommended DePauw consider for possible investments. One evening that week, and again on behalf of DePauw, I met with Gradante and Brian Snider ("Snider"), an employee of Hennessee Group who had arranged and accompanied me to the meetings with the hedge fund managers that day. I requested that Gradante and Snider prepare recommendations to DePauw concerning each of the hedge funds in which Hennessee Group recommended that DePauw invest.

9.     On November 14, 2003, I received e-mail correspondence from Hennessee Group. A true and accurate copy of a printout of that e-mail is attached as Exhibit 2. In response to that e-mail, I requested that Hennessee Group direct e-mail communications to me at my DePauw e-mail address—cmcguire@depauw.edu. My reply is included on Exhibit 2.

10.    Between November 14 and November 18, 2003, DePauw and Hennessee Group worked to finalize the terms of the Investment Advisory Agreement ("Agreement"), a true and accurate copy of which is attached as Exhibit A to the Complaint that DePauw filed in this case on October 12, 2005. I signed the Agreement on behalf of DePauw on November 18, 2003.

11.     I understand that, in addition to its two Managing Principals, Gradante and defendant E. Lee Hennessee ("Lee"), Hennessee Group employs approximately seven analysts. Snider is one such analyst, and he became my primary contact at Hennessee Group.

12.     Over the course of the roughly two-year relationship between DePauw and Hennessee Group, all of the communications and interaction that I had with representatives of Hennessee Group relating to hedge funds were in my capacity as DePauw's Chief Investment Officer; none was in my individual capacity.

13.     From the time that DePauw entered into the Agreement with Hennessee Group in late 2003 until DePauw terminated the Agreement in October 2005, representatives of Hennessee Group communicated with me scores of times via telephone and e-mail. When I am out of my home office, I generally set my office phone to forward to my cellular phone. Sometimes I have received calls from Hennessee Group on my cellular phone while I was in Greencastle, Indiana. For instance, I was at DePauw on August 25, 2005, when Gradante called me, and we spoke on the phone concerning DePauw's investment in the Bayou No Leverage Fund at that time.

14.     As noted, I have received scores of e-mails from Hennessee Group, which Hennessee Group directed to my "depauw.edu" e-mail account. All such e-mails were sent to, and reside on, a computer server on the University's campus in Greencastle, Indiana. I can and do access the e-mail sent to me at that address from wherever I need to—from a computer on DePauw's campus, from my home office, or from any other location to which I may travel on behalf of DePauw.

15.     On November 18, 2003, I sent an e-mail to Snider from my DePauw e-mail address. A true and accurate printout of that e-mail is attached as Exhibit 3. I attached to that e-mail an electronic copy of a memorandum template that I had created. This template reflected the general format that I used to create memoranda for submission to DePauw's Investment Committee. As the attached e-mail reflects, I wanted to use that form, if possible, to submit memoranda to the Investment Committee containing Hennessee Group's recommendations for hedge fund investments and whatever due-diligence and other information Hennessee Group provided in support of its recommendation. As also reflected in the e-mail, I told Snider that I would be in Greencastle, Indiana the following day.

16.     On November 19, 2003, while I was in Greencastle as I had said I would be, Snider responded to my e-mail of the previous day with an e-mail sent to my DePauw e-mail account. A true and accurate printout of that response is attached at Exhibit 3. I in turn responded to Snider's e-mail that same day, from Greencastle, using my DePauw e-mail account. A true and accurate printout of my response is attached as Exhibit 3. In the response, I told Snider that I wanted to include Hennessee Group's investment recommendations in the January Investment Committee meeting book that I would provide to each member of DePauw's Investment Committee.

17.     On December 8, 2003, Snider sent me an e-mail via my DePauw e-mail account attaching drafts of Hennessee Group's "write-ups" for two investment

- 3 -

recommendations—one for the Bayou No Leverage Fund LLC (the "Bayou Fund") and one for the Ascend Offshore Fund, Ltd. True and accurate printouts of that e-mail and of the attached Bayou Fund "write-up" are attached as Exhibit 4. The information contained in this Bayou Fund "write-up" is the information that is referred to in paragraphs 10 and 13 of DePauw's Complaint in this case.

18.     The information that Hennessee Group provided in its "write-up" concerning the Bayou Fund was included without substantive change in the report that was submitted to DePauw's Investment Committee, a true and accurate copy of which is attached to DePauw's Complaint in this case as Exhibit B. At a meeting in Florida on January 16, 2004, Gradante, Lee, and Snider discussed Hennessee Group's recommendation concerning the Bayou Fund, among others, with the members of DePauw's Investment Committee.

19.     As alleged in DePauw's Complaint, DePauw invested a total of $3.25 million in the Bayou Fund in reliance upon Hennessee Group's representations and recommendation.

20.     Thereafter, Hennessee Group sent periodic reports regarding DePauw's hedge fund investments to my DePauw e-mail account, including reports concerning the purported performance of the Bayou Fund. A true and accurate copy of one such report, dated February 10, 2004, is attached as Exhibit 5; the other monthly reports that Hennessee Group sent were similar in format.

21.     Hennessee Group also prepared and sent to my DePauw e-mail account various other presentations for DePauw's Investment Committee. These included presentations to DePauw's Investment Committee dated on or about February 17, 2004; April 2004; October 7, 2004; January 14, 2005; April 22, 2005; June 22, 2005; and October 27, 2005.

22.     In response to a request for additional information from members of DePauw's Investment Committee, Snider also sent to my DePauw e-mail account additional background information regarding the hedge fund industry on September 24, 2004. True and accurate printouts of this e-mail and the attachment to it are attached as Exhibit 6. In that e-mail, Snider stated: "We'd be more than willing to physically give the presentation [to DePauw's Investment Committee] since there are some items that might need to be explained in more detail. Which reminds me, do you want us to be present at your investment committee meeting annually?"

23.     Hennessee Group also sent me, via e-mail to my DePauw e-mail account, numerous performance and monitoring reports concerning the hedge fund investments that DePauw had made at Hennessee Group's recommendation.

24.     On May 13, 2004, Snider sent me a copy of a May 24, 2004 Forbes article authored by Neil Weinberg and Bernard Condon entitled "The Sleaziest Show on Earth." True and accurate printouts of this e-mail and the attachment to it are attached as Exhibit 7. In that e-mail, Snider said "Here is the Forbes article again. Your committee members might ask about it, so I want you to be prepared."

25.    In addition to its communications with me on behalf of DePauw, Hennessee Group also requested to have direct communications with individual members of DePauw's Investment Committee, one of whom is a resident of Indiana. To facilitate those communications, I provided Hennessee Group with contact information for each member of the Investment Committee. As a result, Hennessee Group sent monthly newsletters and miscellaneous other correspondence direct to members of the Investment Committee.

26.    One or more representatives of Hennessee Group had for some months been scheduled to attend the October 2005 meeting of the Investment Committee in conjunction with the meeting of DePauw's Board of Trustees at DePauw's campus in Greencastle, Indiana. In the wake of DePauw's termination of its Agreement with Hennessee Group and filing of this lawsuit, however, the Hennessee Group representatives did not attend that meeting.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 19, 2006.

Carla C. McGuire

- 5 -

# EXHIBIT A(1)



**E. LEE HENNESSEE**
MANAGING PRINCIPAL
**CHARLES J. GRADANTE**
MANAGING PRINCIPAL

500 FIFTH AVENUE, 47TH FLOOR
NEW YORK, NY 10110
(212) 857-4400
(212) 768-8190 FAX

June 11, 2003

W. Jerry Burroughs
DePauw University Investment Management
1 Indiana Square, Suite 2550
Indianapolis, IN 46204

RE:    DePauw University Investment Management

Dear Jerry:

It was a pleasure meeting with you in New York on Friday, May 31, 2003. In preparation for our
meeting on Tuesday, June 17, enclosed please find two copies of the Hennessee Group LLC non-
discretionary investment advisory agreement ("Agreement") for your review and signature. Please
have the appropriate authorized signatory sign both copies of the Agreement, as well as all
attachments, and return both copies to us in the enclosed envelope.

Also enclosed is the Hennessee Group's Form ADV Part II dated April 2, 2001 that provides further
disclosure on our firm.

We look forward to enjoying a long-term investment relationship with you. Please feel free to
contact us with any questions.

Sincerely yours,

Charles Gradante

Enclosures

**HENNESSEE GROUP LLC**
NEW YORK • PALM BEACH • RALEIGH

# EXHIBIT A(2)

**Unknown**

| | |
|---|---|
| **From:** | Brian.Snider@HHFD.COM |
| **Sent:** | Monday, November 17, 2003 2:56 PM |
| **To:** | Carla McGuire |
| **Subject:** | RE: Hennessee |

 

Suggested Change pic30106.pcx (2 KB)
  to Indemnific...

Carla,
Attached is the revised indemnification agreement. I've included this in the advisory agreement and am overnighting two copies for your signature. We also need to determine plans for a meeting or conference call for Ascend, which is located in San Francisco. I hope you had a great weekend. Brian (See attached file: Suggested Change to Indemnification Clause 11.7.03.DOC)


"Carla McGuire" <cmonline@rcn.com> on 11/14/2003 05:14:50 PM

To:    <Brian.Snider@hhfd.com>
cc:

Subject:   RE: Hennessee
(Embedded image moved to file: pic30106.pcx)

Glad to hear we are making progress on the legals. I can not thank you enough for going ahead with our meetings and for forwarding this information.

I just received a call from my attorney. He said your attorney left him a message, but that the two of them had not connected. Hopefully, we will get this finished next week. I am around everyday but Wednesday. On Wednesday I will be traveling to Greencastle.

Thanks again, I really enjoyed the trip and I am very happy with the selection of managers.

I did get my Depauw email to work through my Outlook, so feel free to use my depauw.edu e-mail going forward.

Carla

-----Original Message-----
From: Brian.Snider@HHFD.COM [mailto:Brian.Snider@HHFD.COM]
Sent: Friday, November 14, 2003 4:08 PM
To: cmonline@rcn.com
Subject: Hennessee


Carla,
Attached are the Pertrac exports I promised on each of the funds (we call these ESSs for Executive Summary Sheets). I think we're making progress on the advisory agreement and I should have something to you the beginning of the next week.

Once again, it was great spending time with you this week. As you said, please consider us an extension of your office and if there is anything that we can help with, please let us know. Have a great weekend. Regards, Brian (See attached file: ESS List.xls)

Client agrees to indemnify and hold Hennessee harmless from: (a) any liability to, expense claimed by, or judgment in favor of, a third party, or an amount paid to a third party in settlement thereof, arising as a result of Client's investment in a Hedge Fund for which Hennessee provided services as set forth in Section II hereof; or (b) any loss arising from Hennessee's adherence to a Client's written or oral instructions; or (c) any act or failure to act, whether fraudulent or otherwise, with respect to any Client investment in a Hedge Fund, by a Hedge Fund manager, its affiliates, assigns, agents, employees or counterparties associated in any way with the Hedge Fund, provided that the selection of such Hedge Fund was not the result of any gross negligence by Hennessee, its employees or agents in the discharge of its or their duties hereunder; or (d) any errors or omissions committed by Hennessee, its employees or agents in the discharge of its duties hereunder, unless such errors or omissions constitute gross neglect or willful misfeasance; provided, however, that nothing in this paragraph shall relieve Hennessee from any liability imposed by federal or state securities laws or other applicable laws which cannot be waived. Hennessee shall promptly notify Client in writing of any action, claim or other matter in respect of which Hennessee intends to claim such indemnification. Hennessee shall permit Client, at Client's discretion, to defend or settle any action, claim or other matter, and Hennessee agrees to the complete control of such defense or settlement by Client. Hennessee shall fully cooperate with Client in the investigation and defense of any action, claim or other matter covered by the indemnification obligations of this paragraph. In all events, no such action, claim or other matter shall be settled by Hennessee without the prior written consent of Client, which, if Client has not assumed control of the defense of such action, claim or other matter, shall not be unreasonably withheld or delayed.

799208

# EXHIBIT A(3)

**Unknown**

| | |
|---|---|
| **From:** | Brian.Snider@HHFD.COM |
| **Sent:** | Tuesday, November 25, 2003 9:52 AM |
| **To:** | cmcguire |
| **Subject:** | RE: Write-ups |



pic12623.pcx (2 KB)

Great. Let's plan on Thursday, December 4 at 4pm eastern time for the conference call
with Ascend. On the call will be Malcolm Fairbairn (portfolio manager) and Ben Slavet
(CFO). Brian

cmcguire <cmcguire@DEPAUW.EDU>@DEPAUW.EDU> on 11/25/2003 09:40:39 AM

To:      Brian.Snider@HHFD.COM
cc:

Subject:    RE: Write-ups
(Embedded image moved to file: pic12623.pcx)

Brian,
Thanks for the update. Dec. 5 I have a lunch so Central time between 11 am to 1 pm I will
not be available. The 4th is completely open at this time.

I will start on the subscription docs as soon as I get them. Carla

>===== Original Message From Brian.Snider@HHFD.COM =====
>Carla,
>Just wanted to give you an update on where we stand. We've begun with
>the write-ups and will send them to you as we complete them.
>Mid-December should not be a problem. Also, I've sent requests to each
>of the funds to send offering and subscription documents. You should
>begin receiving them tomorrow. As for Ascend, are there any times on
>Dec 4-5 that you are unable to do a conference call?
>I hope you had a good weekend.
>Regards,
>Brian
>
>
>
>
>
>
>Carla McGuire <cmcguire@DEPAUW.EDU> on 11/19/2003 11:05:28 AM
>
>To:    Brian.Snider@HHFD.COM
>cc:
>
>Subject:    RE: Write-ups
>(Embedded image moved to file: pic19629.pcx)
>
>Brian,
>The timing on the write-ups is whatever is realistic for you. I want
>to include them in my January Investment Committee book, but would like

1

```
>time to review them.  Also, you could send them one at a time if you
>like.  I feel like I am off-loading my work so I don't want to be too
>pushy.  Is mid-December ok?
>Carla
>
>-----Original Message-----
>From: Brian.Snider@HHFD.COM [mailto:Brian.Snider@HHFD.COM]
>Sent: Wednesday, November 19, 2003 9:43 AM
>To: Carla McGuire
>Subject: Re: Write-ups
>
>
>
>Carla, I don't believe we'll have any problems completing the write-ups
for
>each of the managers.  I'll let you know if I have any questions as I
>complete them.  When would you like each of these completed by?
>Regards, Brian
>
>
>
>
>
>"Carla McGuire" <cmcguire@depauw.edu> on 11/18/2003 04:20:29 PM
>
>To:     "Brian Snider" <Brian.Snider@hhfd.com>
>cc:
>
>Subject:    Write-ups
>(Embedded image moved to file: pic13270.pcx)
>
>
>
>Brian,
>
>I put the contracts in the Fed Ex box today.  You should receive them
>some time tomorrow.  Thanks for all your help on that front.
>
>On another front, I am attaching a template of the type of write-up I
>provide the Committee on each manager.  If you could check this out,
>and cut and paste info from your reports, I would really appreciate it.
>
>If you would like to discuss, please do not hesitate to call.  I do
>have
to
>leave around 5 pm CST today and will be in Greencastle tomorrow.  I
>have meetings tomorrow until about 2 EST.  I could get back to you
>after that.
>
>Talk to you soon,
>
>Carla
>(See attached file: template.doc)

Carla C. McGuire, CFA
Chief Investment Officer
DePauw University
512 N. McClurg Ct. Unit 4507
Chicago, IL  60611
Phone: 312-955-8283
```

2

# EXHIBIT A(4)

## Unknown

**From:** Brian.Snider@HHFD.COM
**Sent:** Monday, December 08, 2003 8:06 PM
**To:** cmcguire@DEPAUW.EDU
**Subject:** Write-ups

 

Depauw               Depauw
D_Bayou.doc (95 KB_Ascend.doc (104 K

Carla,

Attached are drafts of the write-ups for Ascend and Bayou. The peer investors, other
universities and endowments, and due diligence sections are a little bare, let's talk
about what you would like to see there. Regards, Brian (See attached file: Depauw
DD_Bayou.doc)(See attached file: Depauw
DD_Ascend.doc)

1

# DePauw University

## Investment Office
## Hedge Fund Investments

## Bayou No Leverage Fund LLC

**Prepared By:**
Carla C. McGuire

**Target Decision Date:**

---

### INVESTMENT RECOMMENDATION FOR BAYOU NO LEVERAGE FUND LLC

**Recommendation**

---

#### I. Partnership Overview & Performance

#### A. Background

Bayou was formed in 1996 after Sam Israel departed from Omega Advisors. Mr. Israel is the managing principal of Bayou Securities (a broker dealer) and Bayou Management (management entity of hedge funds). Bayou Management currently manages $256 million across Bayou Superfund LLC, Bayou No Leverage Fund LLC, Bayou Accredited Fund LLC, Bayou Affiliates Fund, LLC, and Bayou Offshore Fund, Ltd., all of which are managed in a master/feeder structure. As a broker/dealer, Bayou Securities is regulated by the NASD. The firm is entirely owned by Sam Israel.

#### B. Performance

Below is performance of Bayou Superfund LLC which is managed in a master feeder structure alongside Bayou No Leverage Fund LLC.

| Bayou Superfund, LLC | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *(Performance is net of all fees)* | | | | | | | | | | | | |
| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Year |
| 2003 | 1.09% | 0.00% | 1.22% | 1.03% | 1.13% | 1.85% | 2.91% | (0.86%) | 1.65% | 1.46% | | | 12.90% |
| 2002 | (0.03%) | 1.11% | 2.35% | (1.04%) | 2.56% | 1.03% | 0.02% | 0.94% | 1.47% | 1.30% | 0.44% | 0.00% | 11.22% |
| 2001 | 2.70% | (2.40%) | (0.48%) | 1.24% | 1.13% | 2.82% | (0.84%) | 0.88% | (0.81%) | 2.01% | 2.00% | 1.56% | 7.05% |
| 2000 | 5.26% | (1.10%) | 3.44% | 2.71% | 0.01% | 1.21% | 2.32% | 1.49% | 0.84% | 3.15% | 1.01% | 0.01% | 19.02% |
| 1999 | 0.80% | 1.44% | 2.72% | 4.95% | 2.90% | 1.85% | 0.54% | 2.25% | 1.50% | (1.12%) | 2.09% | 3.41% | 28.08% |
| 1998 | (2.86%) | 13.08% | 0.37% | (2.72%) | (4.44%) | 0.51% | 2.89% | 5.30% | 0.44% | 0.62% | 0.84% | 3.14% | 17.55% |
| 1997 | 3.97% | 6.25% | 0.14% | (0.22%) | 20.35% | (10.65%) | (0.94%) | 6.40% | (4.04%) | 4.28% | 3.08% | 4.82% | 32.52% |

#### II. Investment Strategy

Bayou is a long/short equity fund, engaged mostly in short-term trading opportunities. There is no inherent market bias or directionality to the strategy, as the manager has equal comfort with long and short positions. The trading and risk management strategy have been derived from Sam Israel's twenty years of hands on equity trading experience. The strategy has been developed with the belief that the current market environment rewards trading skills over investment skills.

The fund's goal is to achieve consistent returns of 1-3% per month with limited downside volatility or directional risk. As such, the manager strives to limit overnight exposure of the portfolio.

#### III. Investment & Decision Making Process

Bayou has implemented a disciplined investment process in order to achieve maximum return on capital with commensurate risk control. Each day they assess the market conditions through the use of both a fundamental and technical approach. Well before the market opens, they have scripted and discussed what they believe will be the correct approach to trading that day. Because of their smaller size, they are able to take advantage of the volatile rotation in the marketplace experienced on a daily basis, and are able to adjust accordingly.

While the investment decisions are determined at the full discretion of Sam Israel, the opportunities are targeted by proprietary screening tools. Fundamental and qualitative filters assess general market conditions, and an array of real-time quantitative tools pinpoints specific trade opportunities. Proprietary analytics track specific trade targets, and assist in entry/exit decisions. This discipline is applied on both a long and short term basis to identify inflection points on a stock-by-stock basis as well as to identify larger market trends which impact the trading of securities each day.

A team of analysts provides fundamental research by way of economic overview, group and industry dynamics, as well as a bottom-up and top-down analysis of specific companies. Through the use of various media, they scan for any news events that can potentially provide them with trading advantages. They also check daily for any insider activity, SEC filings, industry reports, material changes in filed holdings, and changes in brokerage recommendations on any companies we follow.

## IV. Risk Controls

Each day, Bayou attempts to identify both long and short opportunities in the market in order to keep a balanced portfolio. Net market exposures are tied to the volatility of the market and correlation of offsetting positions (e.g. if long and short tech names, gross positions would tend to be higher than if long tech and short oil service). During the day they are ordinarily well under 100% net long or short in aggregate, but each night they aim to be as balanced as possible to control risk. The fund will never utilize margin and will never be more than 200% gross exposed (longs plus shorts).

Stop-loss orders are typically used on all securities they trade. Often, they will establish an option position as well as a common stock position with the goal of taking a profit in the common shares offsetting the cost of the option positions. Stop losses are employed in all option positions as well, and adjust our risk profiles in any duplicate stock and option positions. From a portfolio basis, Bayou attempts to trim back exposures if daily losses are in the -1.5% range.

For purposes of liquidity, Bayou does not want positions to represent more that 10% of average daily volume and 5% of open interest.

For purposes of managing concentrations, Bayou utilizes a maximum of 5% per stock name, although individual position sizes are often determined by the volatility of the market.

## V. Organization

| Bayou Fund LLC | |
|---|---|
| **Founded** | 1996 |
| **Structure** | The firm manages five funds in a master/feeder structure: Bayou Superfund LLC, Bayou Accredited Fund LLC, Bayou Affiliates Fund LLC, Bayou No Leverage Fund LLC, Bayou Offshore Fund Ltd. |
| **Principals** | Sam Israel |
| **Office Location** | 40 Signal Road, Stamford, CT 06902 |

4

Bayou employs a total of 18 people, consisting of Sam Israel (CIO), Italo Passante (Head Trader), Dan Marino (CFO and COO), 2 senior analysts, 4 junior analysts, 1 controller, and 8 administration/investor relations employees.

### Biographies of Key Employees

#### Sam Israel III – CIO

Sam founded Bayou Management and Bayou Securities in June of 1996. Since 1992, until the formation of the Bayou Fund LLC in 1996, he was head trader for Omega Advisors, which at one time had assets exceeding $4 billion. He was responsible for determining entry and exit points for all portfolio positions, all equity and financial futures executions, as well as sharing responsibility for hedging the portfolio through the use of futures and options. In 1994, Leon Cooperman made Sam a partner of Omega. Prior to that, he was a senior trader with ARA Associates, a Gruntal & Company affiliated hedge fund with assets of $100 million. He began his career at F.J. Graber & Co., a New York Stock Exchange Member and money management firm geared toward high velocity trading on leveraged portfolios with significant portfolio turnover. Sam has an undergraduate degree from Tulane University.

#### Italo Passante – Head Trader

Italo has been with Bayou since April of 1998 and has 9 years of industry experience. Most recently an institutional sales/trader at Cantor, Fitzgerald & Co. in NYC, he brings with him substantial experience. Previously, Mr. Passante was with Smith Barney as a registered representative, his customer base being hedge funds and mid-sized institutional-trading accounts. Mr. Passante holds a B.A. from New York University. Mr. Passante is a Senior Equity Trader at Bayou.

#### Andrew Chapro – Senior Analyst

Andrew joined Bayou in August 1999. Previously, Mr. Chapro worked as an order execution coordinator for Alexander E. Chapro, an independent NYSE floor broker. Mr. Chapro was responsible for assisting their larger customers, ranging from member firms to mutual fund complexes, in executing equity orders. He also kept track of order status, both intra-day and to final settlement. Mr. Chapro is a graduate of Richmond College in London and holds a graduate degree from the London School of Economics. Mr. Chapro's familiarity with the use of electronic execution tools and his experience in working order flow and position reconciliation enables him to oversee Bayou's customer execution business.

### VI. Peer Investors, Due Diligence, Risks & Reasons to Invest:

#### A. Peer Investors

- **University Endowments and Foundations**
- **Other Investors**

Of the $256 million that Bayou is currently managing, approximately 20% is invested by institutions (mostly endowments and foundations), 50% by family offices/high net worth individuals, and 30% by fund-of-funds.

- **Investors in Other Products** (the firm does not have products outside of this strategy)

# DePauw University

## Investment Office
## Hedge Fund Investments

## Ascend Offshore Fund, Ltd.

**Prepared By:**
Carla C. McGuire

**Target Decision Date:**

## INVESTMENT RECOMMENDATION FOR Ascend Offshore Fund Ltd.

**Recommendation**

### I. Partnership Overview & Performance

#### A. Background

Ascend Capital LLC was formed in 1999, and management of Ascend Partners, L.P. began in January 2000. Ascend Capital currently manages $697 million across Ascend Partners, L.P. (onshore 3c1), Ascend Partners Sapient, L.P. (onshore 3c7), Ascend Offshore Fund, Ltd, and two separate accounts. The firm is registered as a Registered Investment Adviser with the State of California. The firm is entirely owned by Malcolm Fairbairn.

Malcolm Fairbairn is the portfolio manager of Ascend Capital. He was previously a portfolio manager at Citadel from 1997 to 1998, where he was Director of Structured Equities and then portfolio manager of Orchard Partners, L.P. Prior to that, he was a senior analyst for Mark Strome from 1994 to 1997. The manager has a track record from each of these firms. He served as an analyst for Capital Research and Management Group in LA. Mr. Fairbairn received an MBA from Harvard in 1994 and also holds a Bachelor of Science and Master of Engineering in Chemical Engineering from MIT.

#### B. Performance

Below is performance of Ascend Partners, L.P., which is managed pari pasu to Ascend Offshore Fund, Ltd.

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2003 | 0.72% | 0.48% | (0.30%) | 0.17% | 0.15% | 1.76% | 0.45% | (0.00%) | 0.40% | 2.70% | | | 8.06% |
| 2002 | 1.27% | (0.27%) | 0.23% | 0.17% | 0.62% | (0.25%) | 0.46% | (0.26%) | 0.20% | (1.07%) | 0.99% | 0.56% | 2.68% |
| 2001 | 0.35% | 0.96% | 0.89% | 0.34% | 2.30% | 2.03% | 1.66% | 0.63% | 0.93% | 0.74% | 0.72% | 1.66% | 14.01% |
| 2000 | 8.57% | 13.37% | 13.06% | 4.85% | 5.51% | 2.49% | 2.70% | 4.22% | 3.14% | 0.94% | 2.26% | 3.14% | 82.06% |

*Ascend Partners, L.P.*
*(Performance is net of all fees)*

### II. Investment Strategy

Ascend employs an opportunistic, long/short equity investment strategy that continually strives to generate superior, risk-adjusted returns over a broad range of market environments. To achieve this end, Ascend utilizes a two-prong strategy:

• Anticipation of changes in the economic environment that will help or hinder particular sectors and industries, and

•Identification of companies through a disciplined process involving extensive bottom-up fundamental research.

Ascend's approach is well matched with the goal that they share with our clients: to both maximize gain and minimize volatility over the long term, seek to achieve superior, positive performance in both rising and falling markets.

### III. Investment & Decision Making Process

Ascend Capital's analytical process attempts to identify situations where potential catalysts can drive the realization of a company's value. Their top-down analysis looks for market changes that may be prompted by demographic trends, inflation expectations, or supply/demand patterns. The goal is to pinpoint industries in which demand is growing, supply conditions are improving, and pricing power is sustainable.

Ascend's macroeconomic perspective complements their extensive bottom-up research, focusing on quantitative measures, such as cash flows, earnings and price to book ratios and qualitative factors, such as restructuring opportunities, management strengths, and the ability to capitalize on improving fundamentals.

Long positions are initiated based upon strong business fundamentals including:

- a) Improvements in revenue and earnings growth
- b) Strong cash flows and/or access to capital
- c) Competitive advantage in their industry
- d) High barriers to entry
- e) Innovative products
- f) Proven management teams
- g) Short/intermediate term "catalysts"
- h) Undiscovered value on a balance sheet
- i) Out of favor industries at cheap valuations
- j) Extensive insider buying
- k) Under-followed stock by Wall Street.

Short positions are initiated based upon deteriorating company fundamentals (not solely on over-valuation) including:

- a) Balance sheet irregularities and/or questionable accounting
- b) Decelerating earnings
- c) Product cycle dislocations
- d) Equity dilution
- e) Weak management teams
- f) Flawed business models
- g) Unrealistic projections by management
- h) Increasing competition
- i) Clear catalyst to send the stock lower
- j) Unusual insider selling
- k) Expiration of lock-up period.

### IV. Risk Controls

Historically, the fund has been between –5% net short and +40% net long, and therefore has used low net exposures to manage market risk. However, the fund has been in existence mostly through a bear market, and the manager can be expected to increase its net long exposure should fundamentals improve and valuations become more compelling. The manager is very cognizant of the effects of sector exposures and the impact of covariance on the portfolio. They have written their own programming to monitor covariance and beta on a real time basis.

4

Historically, the fund has had a maximum gross exposure (long plus short exposure) of 120%. The fund will never utilize more than 200% gross exposure.

While the firm does not have hard stop losses, they are much more likely to sell losses as opposed to doubling down. Positions are closed out if:

a) Management fails to execute plan
b) If the position reaches its stop loss or target price
c) If investment thesis plays out
d) If an event fails to confirm thesis
e) Fundamentals change thus changing the risk/reward profile.

Typical position sizes are 25 bps to 2%. Maximum position sizes would be 10% upon appreciation, although they have never been close to this.

In general, the manager does not want to own more than one day of trading volume in a position, and therefore, would be able to sell the entire position in five days at 20% of the daily volume. Exceptions to this will be taken, but the manager must receive additional return for the additional liquidity risk.

## V. Organization

| Ascend Capital | |
|---|---|
| **Founded** | 1999 |
| **Structure** | Ascend Capital LLC (management company) is entirely employee owned and manages Ascend Partners L.P., Ascend Partners Sapient L.P. and Ascend Offshore Fund Ltd. which are all managed pari passu |
| **Principals** | Malcolm Fairbairn |
| **Office Location** | 600 Montgomery Street, 37th Floor, San Francisco, CA 94111 |

Ascend Capital employs a total of 14 people: Malcolm Fairbairn (portfolio manager), four senior analysts (Damian Marhefka, Kelly Wiesbrock, Jason Wells, and Michael Prouting), Emily Wang (senior trader), Ben Slavet (CFO), four junior analysts, two junior traders, and one administrative person.

### Biographies of Key Employees

### Malcolm Fairbairn - Portfolio Manager
Malcolm Fairbairn founded Ascend Capital in 1999. Prior to launching the fund, Mr. Fairbairn was Managing Director of Structured Equities for Citadel Investment Group, Inc. in Chicago, Illinois (a $2 billion hedge fund investment group). He then started and managed Orchard Partners, L.P., for Citadel Investment Group in San Francisco. From 1994 to 1997, Mr. Fairbairn worked as Senior Analyst for Strome Susskind, L.P. (a $500 million hedge fund investment group) and was a

Portfolio Manager for Strome HedgeCap, L.P., in Santa Monica, California. In 1993, he served as an Equity Analyst for Capital Research and Management Group (a $150 billion mutual fund family) in Los Angeles. Mr. Fairbairn received his MBA from Harvard Business School in 1994 and was awarded his Bachelor of Science and Master of Engineering degrees in Chemical Engineering from Massachusetts Institute of Technology in 1985.

### Kelly D. Wiesbrock – Senior Analyst

Kelly Wiesbrock joined Ascend Capital as an Analyst in October 2000. Before joining Ascend, Mr. Wiesbrock held positions as Vice President of Corporate Development and Chief Financial Officer in the Dealer Division of Purina Mills, Inc., a $1 billion animal nutrition company. From 1994 to 1998, Mr. Wiesbrock was a management consultant for Deloitte Consulting. At Deloitte, he specialized in advising financially distressed retail clients. Mr. Wiesbrock also developed significant experience in health care, advising HMOs, hospitals and physician groups on strategic issues. From 1988 to
1992, Mr. Wiesbrock worked as an Engineering Project Manager for Frito-Lay, where he managed new plant construction projects, production line expansions and national quality programs. Mr. Wiesbrock earned his Bachelor of Science in Mechanical Engineering from the University of Illinois in 1988 and was awarded his MBA from Harvard Business School in 1994.

### Jason Wells, CFA – Senior Analyst

Jason Wells joined Ascend Capital as an Analyst in March 2001. Before coming to Ascend, Mr. Wells worked as a Research Analyst at Wit SoundView in the Internet Systems and Appliances group where he covered consumer PC and device companies. Mr. Wells began his Wall Street career in 1997 at Banc of America Securities where he worked in the PC and computer systems group. Prior to joining Banc of America, he worked as a Senior Business Analyst at Encad, Inc. Mr. Wells has been a Chartered Financial Analyst since 1998 and earned his B.S. in Management Science from the University of California at San Diego in 1995, where he graduated with highest distinction.

### Damian M. Marhefka – Senior Analyst

Damian Marhefka joined Ascend Capital as an Analyst in February 2000. From 1994 to 1998, Mr. Marhefka worked as an investigative reporter and analyst in Moscow, Russia for Russian Petroleum Investor, a publication and consulting service specializing in the petroleum industry of Russia and the Caspian region. Mr. Marhefka also founded and published The Azeri Times, a business-focused, English-language newspaper serving the expatriate community in Baku, Azerbaijan. Mr. Marhefka received his Master of Arts degree in Communications from the University of Washington in 1993 and was awarded his Bachelor of Arts degree, with honors, in Communications from Stanford University in 1991. Mr. Marhefka is currently a Chartered Financial Analyst candidate.

### Michael Prouting, CFA – Senior Analyst

Michael Prouting joined Ascend Capital as an Analyst in April 2003. Mr. Prouting managed his own long/short portfolio prior to joining Ascend, and was previously a Senior Equity Analyst and Portfolio Manager at Insight Capital. Mr. Prouting's prior work experience includes marketing and business development work for a technology licensing start-up, and investment banking work in the software industry. Mr. Prouting is a Chartered Financial Analyst, and received his MBA from Stanford Business School where he was an Arjay Miller Scholar. Mr. Prouting graduated from the University of Auckland with a Bachelor of Commerce and a Bachelor of Laws with Honors, and practiced commercial law in New Zealand for three years prior to attending Stanford Business School.

### Emily Wang - Head Trader

6

Emily Wang has been a member of Ascend Capital since its inception as both a trader and analyst. From 1987 to 1997, Ms. Wang worked as a Vice President at Kidder-Peabody and as a Senior Financial Consultant for Merrill Lynch Private Clients Group, where she was a member of the prestigious Chairman's Club for production performance and was consistently in the top ranks of Merrill's 11,000-strong sales force. Prior to joining Merrill, Ms. Wang worked as a Project Engineer and Production Supervisor for Frito-Lay (a division of Pepsi) from 1985-1987. During that time,
she also managed a portfolio of distressed residential investment real estate. Ms. Wang graduated from California State Polytechnic University with a Bachelor of Science in Chemical Engineering in 1985.

**Benjamin D. Slavet, CPA- Chief Financial Officer**
Ben Slavet joined Ascend Capital in September 2001. Mr. Slavet is a CPA and has been registered with the NASD as a Financial and Operations Principal. Most recently Mr. Slavet served as the Controller for Scudder Weisel Capital, where he was responsible for all of the financial operations for a registered broker/dealer and investment advisor. From 1992 to 2000, Mr. Slavet worked for KPMG LLP. Mr. Slavet was a Senior Manager in KPMG's Investment Services Practice, where he provided audit, tax and consulting services to clients within the investment company industry. Mr. Slavet graduated from the University of Massachusetts-Amherst with a Bachelor of Science in Accounting in 1992.

## VI. Peer Investors, Due Diligence, Risks & Reasons to Invest:

### A. Peer Investors

- **University Endowments and Foundations**
- **Other Investors**

Of the $697 million that Ascend is currently managing, approximately 20% is invested by endowments and foundations, 10% by pension funds 30% by family offices/high net worth individuals, and 40% by fund-of-funds.

- **Investors in Other Products** (the firm does not have products outside of this strategy)

### B. Due Diligence

Hennessee Group has spoken to former employers of Malcolm Fairbairn and peers (hedge fund managers) of Mr. Fairbairn's in the San Francisco area. Furthermore, Hennessee has conducted a background check on Mr. Fairbairn and Ascend.

### C. Risks

The manager stated that the Achilles heel of the strategy would be a period where the stock prices of certain companies goes up prior to their fundamentals improving. They will often get hurt on the short side in these rallies and may lose money. They are attempting to work through some sentiment readings to get better in these scenarios, but haven't been able to do so as of yet. He also is working with the analysts to objectively weigh the risk versus reward of each stock in the portfolio, so if a stock has already fallen substantially and the

downside is limited, it is time to cover the short before a short cover rally occurs. Also, they are doing some covariance studies relative to short interest.

## VII. Terms and Conditions

| Term | Standard Term |
|------|---------------|
| **Investment Vehicle** | Ascend Offshore Fund Ltd. |
| **Location of Principals** | San Francisco, CA |
| **Size** | $436 million in Ascend Offshore Fund Ltd; $697 million three funds and two separate accounts managed pari pasu by Ascend. |
| **Planned Strategy Capacity** | $1 billion |
| **Total Firm Assets** | $697 million |
| **High Water Mark** | Yes |
| **Management Fee** | 1.5% |
| **Incentive Fee** | 20% |
| **Auditor** | KPMG |
| **Legal Counsel** | Cobb & Eisenberg |
| **Average Leverage** | Typically average of 90-100% gross exposure (long plus short); Maximum of 200% gross exposure. |