# EXHIBIT C

# The New York Times
nytimes.com

---

**September 17, 2005**
Clues to a Hedge Fund's Collapse
**By GRETCHEN MORGENSON**

*This article was reported by Gretchen Morgenson, Jenny Anderson, Geraldine Fabrikant and Riva D. Atlas and written by Ms. Morgenson.*

"If there is a hell I will be there for eternity."

So reads a passage in the six-page "suicide note and confession" written by Daniel E. Marino, chief financial officer of the Bayou Group, a hedge fund firm in Stamford, Conn., that was accused by federal prosecutors on Sept. 1 of conducting a $300 million fraud. The note, whose contents were confirmed by two officials who have seen it, answers in sometimes gripping detail the questions that have consumed Bayou's investors since the fund's problems exploded into view one month ago.

Mr. Marino never followed through on his suicide threat, but the letter was recovered by local authorities last month. Of course, his account of years of deceit at Bayou is only one side of the story and some of the details remain unconfirmed, but prosecutors and law enforcement officials appear to be treating his letter as a crucial road map in their investigation. Indeed, the civil suit filed by the United States attorney against Bayou this month closely tracks the letter's details.

Mr. Marino's narrative starts on the last trading day of December 1998, more than three years after Bayou was founded by Samuel Israel III, a scion of a commodity-trading family that is well known to Wall Street. On that final day of a tumultuous year in the markets - three months earlier, another hedge fund known as Long-Term Capital Management had nearly collapsed, causing widespread disruption in the financial world - Mr. Israel called two of his colleagues into a conference room.

All three men knew the situation was dire at Bayou - the funds' losses had vastly overwhelmed their gains for more than two years. Something had to be done, and fast.

The solution, devised by Mr. Israel and a lieutenant, James Marquez, was simple: produce a fake audit of the funds' performance and try to make up the losses next year.

In the end, of course, the plan failed. The losses compounded and the results Bayou reported to its investors - several years of market-beating returns - were consistently false.

So far, Bayou investors hoping to understand what happened to their money have been in the dark about what went on at the fund. But Mr. Marino's letter, along with an examination of Bayou's financial documents and interviews with many of Mr. Israel's friends and former colleagues fill in the missing pieces of the funds' startling collapse.

Because almost everything that Bayou executives told investors over the years now appears to be false, it is perhaps not surprising that people who have known Mr. Israel for years say that the image he projected to his clients was more about what he hoped to be than what he actually was.

For example, although he told his investors he was a third-generation trader, coming as he did from a family of successful commodities traders dating back to the 1890's, for much of his career on Wall Street he remained a low-level order taker who bounced from one obscure firm to another.

And while Mr. Israel came off as a spirited, affable prankster to outsiders, to close associates he could be demeaning and threatening, even to the point of wielding a gun at Mr. Marino in 2002 when he refused to follow Mr. Israel's orders, according to Mr. Marino's letter.

"What is interesting about this is it was not just a lie, it was a very good and elaborate lie," said John C. Siegesmund III, a Colorado investor who put $250,000 into one of the Bayou Funds in 2003.

It is believed that Mr. Israel, 47, remains where he has been since the scandal broke: holed up in the 1920's-era stone mansion in Mount Kisco, N.Y., that he rents for $32,000 a month from Donald J. Trump. He has not returned numerous calls requesting interviews. His lawyer did not return phone calls.

If Mr. Israel is indeed in Mount Kisco, he is not far from the elegant home on the grounds of the Westchester Country Club where he grew up. The house backed onto the third hole of the golf club's so-called south course, according to a friend of many years, who said, "Sammy started out living large."

But if Mr. Israel hoped that his foray into hedge fund management would burnish his venerable family's reputation for savvy and successful securities trading, he appears to have failed spectacularly.

In the slick and sometimes swashbuckling world of hedge funds, Mr. Israel and Mr. Marino, 46, were an odd but perfect pair. Mr. Israel, the product of Southern money and Tulane University merriment, boasted of his days among Wall Street's best while charming people as a wisecracker with a passion and edge for the markets.

Mr. Marino, an accountant with a severe hearing problem and a lisp, bore neither pedigree nor power. In the mid-1980's, as he pursued his career in accounting, he lived with his mother in Staten Island, drove a leased maroon Maxima and worked for a second-tier accounting firm, according to one person who worked with him.

Mr. Marino has not returned phone calls seeking comment. Andrew B. Bowman, a lawyer in Westport, Conn., who represents Mr. Marino, declined to comment about the letter or what took place at the fund.

A lawyer for Mr. Marquez, Stan Twardy of Day Berry & Howard, said: "Our communications on this topic are with the U.S. attorney's office only. To ensure the record is accurate, I will confirm that James Marquez has had no involvement in Bayou for years."

But for wealthy investors looking to dabble in the glamorous and promising world of hedge funds, Bayou's top two men offered an ideal balance: a big ego to make money and an accountant to keep it clean.

'If anyone got near anything, I would browbeat them away.'

According to Mr. Marino's letter, none of Bayou's lower-level employees knew about the charade that began in 1998. Certainly both Mr. Israel and Mr. Marino knew that if Bayou's investors got wind of the funds' losses they would flee. And any hopes Mr. Israel may have had of adding his name to the list of savvy traders in his family would have been dashed.

Mr. Israel knew only too well how quickly investors could turn on him. In the very early days of Bayou, investors had defected at the first sign of losses. A former hedge fund trader who spoke on the condition that he remain unidentified said that in mid-1996 he invested $150,000 in Bayou. But at the end of the year, he said he asked for his money back because the fund had fallen about 14 percent.

Mr. Israel had a tendency not to communicate bad news, this person recalled. "At first I got letters all the time, and the fund was up, and then I got no letters for a while and suddenly, the fund was down," the former investor said. "That was when I took the money out."

The 1998 attempt to recoup trading losses at Bayou was to involve two steps, according to the plan outlined in Mr. Marino's letter. First, Mr. Israel would raise fresh funds from investors and trade his way to outsized gains on that money. In addition, the commissions generated by the Bayou funds' trades - almost always executed by Bayou Securities, the brokerage firm owned by Mr. Israel - would be credited back to the funds to help offset the losses. Because Mr. Israel was known for his rapid-fire trading, the commissions would be high, Mr. Marino's letter said.

But hiding a mountain of past losses from investors also meant that the fund's auditor had to be replaced. A new accounting firm - Richmond-Fairfield - was created to oversee the fake bookkeeping, prosecutors contend. Mr. Marino was the firm's principal.

The plan, as described by Mr. Marino, certainly helps explain some of the unusual aspects of the Bayou Funds. For example, Mr. Israel did not charge his investors the traditional hedge fund management fees of 1 percent to 2 percent of assets. Instead he restricted his pay to 20 percent of the funds' gains. In addition, the minimum investment Mr. Israel required of his clients - $250,000 - was much smaller than is typical among hedge funds.

Since Mr. Israel needed to attract more money to get out of the hole he was in, lower management fees and smaller minimum investments certainly could not hurt the funds' appeal to new investors. Indeed, some investors who bought into the funds in 2003 said that both were factors in their choice of Mr. Israel as a fund manager.

With the plan in place, Bayou officials reported its 1998 performance to investors: a gain of 17.55 percent. December was an especially good month, fund officials said, showing a profit of 3.14 percent.

Other aspects of Mr. Israel's career history and Bayou's operations were changed to enhance appearances or gloss over troubles. For example, while documents given to prospective investors in 2003 said that Mr. Israel started Bayou Funds in 1997, some early investors said the fund opened in 1996. It turned in a poor performance, however, possibly driving Mr. Israel to edit 1996 entirely from the Bayou record books.

Clearly, Mr. Israel's claim to have been a "born trader" was another fiction. According to Emanuel Gerard, for whom he worked briefly in 1990 at Gerard Klauer Mattison, Mr. Israel turned in better performances in down markets than up. Mr. Gerard said he invested a small amount of money in Bayou as a sort of hedge against a market fall, but that he redeemed his investment last year.

As Mr. Israel set out to start Bayou in the mid-1990's, according to two of his former investors and longtime friends, he collaborated with Stanley P. Patrick, a quantitative stock trader, to develop a computerized trading strategy. In 1990, Mr. Patrick had been charged with trading on inside information provided by Eben P. Smith, a broker at Jeffer Management, an investment firm that was defunct by that time.

The government asserted that Mr. Smith had received information from a former lawyer at Skadden Arps Slate Meagher & Flom. Mr. Patrick pleaded guilty to the charges and was barred from the securities industry in 1994. After Mr. Israel and Mr. Patrick created the trading strategy, the two men went their separate ways. Mr. Patrick could not be reached for comment.

Another early investor was Martin Payson, the former vice chairman at Time Warner, who recalled in an interview last week that he knew and admired the Israel family. Mr. Payson had been on the board of Tulane University for 13 years and knew Mr. Israel's father. He said that he took the younger Mr. Israel to dinner in Manhattan and liked him. "I don't think we even talked much about the fund," he said.

Mr. Payson said that he viewed the fund as an offset to the market. He did not redeem his investment; he said he had no idea there were problems and felt betrayed.

Tremont Capital Management, a well-respected funds manager, invested in Bayou around 2000, according to people briefed on the investment, although it redeemed its investments around two years later.

With clients like these, Mr. Israel became better known. Bayou's assets really started to grow in 2001 and 2002 when consulting firms and funds started recommending Bayou to their clients.

And in 2002, John Mauldin, president of Millennium Wave Investments, an investment adviser in Arlington, Tex., wrote an admiring profile of Mr. Israel and his trading technique. Another consultant that recommended Bayou to its clients was the Hennessee Group of New York.

Investors liked Mr. Israel's constant communications, via e-mail, about the markets and the progress of their investments. He was down to earth, not arrogant. He spoke plainly and didn't seem to fall for Wall Street fads.

"As we've written so many times, the new age stocks continue to ascend," Mr. Israel wrote to investors in January 2000, just before the Nasdaq peaked. "It is our job to stand ever at the ready to identify any cracks in the armor and to act when this mania ends."

But one aspect of Mr. Israel's operations did raise some concern among investors: The fact that his brokerage firm, Bayou Securities, executed all the hedge fund's trades put him in a position to profit at the expense of his fund clients.

Shrewdly, Bayou's marketing materials tackled the potential for conflicts in the arrangement head-on. Although the goal of the setup was to reduce trading costs, the materials acknowledge that it could lead to higher costs and greater profits for Mr. Israel.

By confronting the potential problem directly, Mr. Israel disarmed many critics. And to some investors, any concern about the conflict was more than offset by the fact that the brokerage firm was registered with securities regulators, and subject to routine and surprise examinations.

In any case, the money flowed in and both Mr. Israel and Mr. Marino began living well off the seeming success of the hedge fund. Gone was Mr. Marino's beat-up Maxima and Staten Island address. In October 2003, he bought a six-bedroom colonial-style home in Westport for $2.9 million, paying mostly cash. Soon he was driving a Bentley.

That same year, in the midst of divorce proceedings, Mr. Israel moved into the Mount Kisco estate built for H. J. Heinz, the ketchup magnate.

'The end was near.'

Although Bayou's falsified returns looked great - market-beating gains of 26 percent in 1999, almost 20 percent in 2000 and 7 percent in 2001 - some of the consultants who had recommended the funds to their clients were becoming wary about aspects of its operations.

By 2002, for example, Tremont withdrew its funds after noticing a sizable gap between returns on Bayou's offshore funds and its domestic portfolio, according to several people briefed on the investment. When Tremont asked officials at Bayou about the discrepancy, these people said they were told that Bayou had shifted profitable trades made in its United States funds to the offshore portfolios, in an attempt to increase the offshore funds' performance and attract more assets.

Mr. Mauldin said he advised his clients to exit the funds in the summer of 2004. He declined to say why he changed his mind on Mr. Israel. Some consultants, however, including the Hennessee Group, kept their clients in the Bayou Funds until the end.

Mr. Israel and Mr. Marino could not have been pleased to see these redemptions roll in. After all, withdrawals were not part of the plan.

The stress associated with the redemptions may be reflected in income statements and other financial documents filed by Bayou Securities.

For a brokerage firm to conduct business with clients, securities regulators require that it have a certain amount of capital on hand. In March 2004, Bayou Securities had a net capital position of $5.9 million, and had borrowed 9 percent of that amount, its filings said.

By December 2004, however, the firm's net capital had declined to $259,731 and at the end of March it had fallen to $164,237. At that point, Bayou Securities' borrowings represented 161 percent of its capital. The firm showed a loss of $325,912.

Even as Bayou Securities' financial position was teetering, the documents show that it paid for limousine services ($5,000 a month), restaurant meals ($4,000 a month), the lease of a private jet ($100,000) and even the services of a counterespionage consultant ($20,000).

Some of the largest amounts that were withdrawn from Bayou Securities paid for consulting and professional fees. Such payments had typically approached $60,000 a month. But in March they jumped to $431,000; by the end of June 2005, Bayou Securities had paid out $1.1 million in consulting fees.

One investment firm that received a lot of money from Bayou was Eqyty Research and Management, a money management firm in Boston. From July 2003 to March 2005, Eqyty Research received $700,000 from Bayou Securities.

Jeffrey D. Fotta, a co-founder of Eqyty Research, said that the payments were for research on stocks. He said that he was unaware of any wrongdoing at Bayou and that as recently as May, his firm was recommending trades to the fund.

Legal fees, understandably, were also rising for Bayou. Over the course of three weeks in June of this year, a lawyer named Jan Morton Heger received $461,000 in payments from Bayou Securities, according to the financial statements. Mr. Heger had not shown up in documents from previous periods. He did not respond to an e-mail message requesting comment and a telephone number for him was out of service.

'I am sorry for the people I hurt.'

One of the most compelling mysteries about the Bayou mess is why Mr. Israel decided to close the funds in July, effectively blowing the whistle on himself. Once again, Mr. Marino's letter provides a credible explanation.

With so many investors fleeing Bayou, the situation had grown increasingly grave.

On Dec. 4, 2004, the fund's board met and adopted a resolution to allow Bayou's president, Mr. Israel, to hold $100 million in his own name to invest. That board consisted of Mr. Israel and his No. 2, Mr. Marino. The move appears to have been the beginnings of a last-ditch effort to recoup years of Bayou's losses.

In March, Mr. Israel entered into an agreement with Lewis Malouf, a managing director of Bayou as well as a principal of Charles Financial, according to court documents, to invest the $100 million in bank instruments that would supposedly yield $7.1 billion over 10 years. The money was given to Karl Johnson, who was going to invest the money for Mr. Malouf. Neither Mr. Malouf nor Mr. Johnson returned calls seeking comment.

But Arizona regulators seized the funds in May, suspecting that the money was related to a different fraud; they knew nothing about Bayou or Mr. Israel. Then, Mr. Israel's lawyers, in cooperation with Mr. Johnson, sued to quash the seizure on the basis that Arizona had no right to the money. In the process, Mr. Israel's lawyers provided account documents proving the money was his.

When Arizona kept the money, Mr. Israel and Mr. Marino must have known that the end was near.

On July 27, Mr. Israel notified investors that he was closing the Bayou funds to spend more time with his family. Investors would receive their funds in mid-August, he said. They never did. Mr. Israel's communications stopped.

According to prosecutors, that $100 million in Arizona is believed to be the last remaining property of Bayou investors.

Copyright 2005 The New York Times Company | Home | Privacy Policy | Search | Corrections | XML | Help | Conta